### L. ALBERT & SON v. ARMSTRONG RUBBER CO.

No. 6, Docket 21183.

United States Court of Appeals Second Circuit.

Argued Oct. 5, 1949.

Decided Nov. 29, 1949.

Abraham S. Ullman, Irving Sweedler and William L. Beers, New Haven, Conn., for plaintiff.

Albert H. Barclay and William L. Hadden, New Haven, Conn., with whom on the brief were Albert H. Barclay, Jr. and John W. Barclay, New Haven, Conn., for defendant.

Before L. HAND, Chief Judge and SWAN and CLARK, Circuit Judges.

L. HAND, Chief Judge.

Both sides appeal from the judgment in an action brought by the Albert Company, which we shall speak of as the Seller, against the Armstrong Company, which we shall call the Buyer. The action was to recover the agreed price of four "Refiners," machines designed to recondition old rubber; the contract of sale was by an exchange of letters in December, 1942, and the Seller delivered two of the four "Refiners" in August, 1943, and the other two on either August 31st or September 8th, 1945. Because of the delay in delivery of the second two, the Buyer refused to accept all four in October, 1945—the exact day not being fixed—and it counterclaimed for the Seller's breach. The judge dismissed both the complaint and the counterclaim; but he gave judgment to the Seller for the value without interest of a part of the equipment delivered—a 300 horse-power motor and accessories—which the Buyer put into use on February 20th, 1946. On the appeal the Seller's position is that its delay was not too long; that in any event the Buyer accepted delivery of the four "Refiners"; and that they were in accordance with the specifications. As an alternative it insists that the Buyer is liable, not only for the value of the motor, but for interest upon it; and, as to the counterclaim, that the Buyer proved no damages, assuming that there was a breach. The judge found that all four "Refiners" conformed to the specifications, or could have been made to do so with slight trouble and expense; that the contract was inseparable and called for four not two and two; that the delivery of the second two was too late; and that, as the Buyer rejected all four, it was not liable on the contract at all. On the

other hand, as we have said, he found that the Buyer's use for its own purposes of the motor, although not an acceptance of the "Refiners," made it liable for the value of the motor in quasi contract, but without interest. He dismissed the Buyer's counterclaim because it had failed to prove any damages.

The first issue is whether the Seller's delivery of the second two "Refiners" was too late, and justified the Buyer's rejection of all four in October of that year. The Seller does not—at least on this appeal—seek to recover the purchase price of the first two "Refiners" on the ground that the parties had at any time severed the contract into two separate ones, each for two. It follows that the Buyer was entitled in October, 1945, to reject the four, if the delivery of the second two was too late. The evidence as to this was as follows. Although the Buyer had suggested cancellation of the contract in the spring of 1943, by April first of that year it was pressing for delivery, and, when the Seller wrote at the end of July that it would ship the first two in "a couple of weeks," and the other two probably within four weeks, the Buyer not only did not protest against the delay, but in August accepted the two which the Seller did deliver. Moreover, when the Seller did not ship the other two within the time mentioned, the Buyer on October first, 1943, recognized the contract as still in existence. True, by the end of that year it began to complain of the performance of the two machines delivered, and it suggested that the Seller take them back; but, when the Seller answered by offering to put these two in proper condition, an active correspondence followed, resulting in a personal interview between the heads of the two parties in July, 1944. At this there was an inconclusive discussion of settlement, after which in August the Buyer agreed to install the two; and in September the Seller recognized the original contract as still in existence. Although in December the Buyer did declare its doubts whether it would be able "to keep these machines in production without considerable maintenance expense," and proposed a resale of them to the Seller, apparently the Seller did not reply; and in any event this proposal lapsed, for on February 23d, 1945, the Buyer wrote that it "would like to have you ship the two remaining Refiners at once." This demand the Seller answered by complaining that the two already delivered had never been paid for, to which on March 28th the Buyer rejoined that nothing was due on the contract until "30 days after the delivery of the complete order." It continued: "We want to complete the installation of this refiner line and are again requesting you to ship the two remaining refiners if they are in good operating condition."

Thus it appears that, whatever may have been the Seller's delay up to that time, the Buyer would have been bound to accept a delivery of the second two within a reasonable time after March 28th, and to pay for the four, assuming that they conformed to the specifications, as the judge found that they did. As we understand it, the parties are not at variance so far, except for the finding as to conformity, just mentioned, which turns out to be irrelevant, as will appear. Since the Seller did not deliver the second two machines until five months after the demand of March 28th, the first question is whether the judge was right in holding that that was too late. When the Seller in July, 1943, said that it would ship the second two machines within four weeks, we will assume that that was the proper measure of a reasonable time for their delivery, and would have been conclusive, had it not been for the conduct of the parties during the following eighteen months. However, although during that period the Buyer had been in doubt whether it could make operative the two already delivered, it had never even intimated an objection to the delay in the delivery of the second two. If the circumstances had not changed as much as they did during the five months after March 28th, it might therefore be plausibly argued that the long drawn negotiations showed that further delay was not of vital consequence, in spite of the fact that in mercantile contracts, time is ordinarily "of the essence."[1] Nevertheless, we

---

1. Restatement of Contracts, § 276 (b).

think it impossible to excuse the delay, because the circumstances did greatly change after March 28th, 1945. The judge found that "the great demand at the time of the commencement of this program for low-grade reclaimed rubber was of a temporary nature"; it could not compete with any other rubber if that appeared in "sufficient" quantities. That did not mean that rubber was not still "reclaimed" and sold in the open market; but "obviously market conditions for second-hand rubber-machinery changed between the days of acute shortage in which the contract was made and the time of delivery." We accept his summing up of the situation in the following words: "at approximately the date of delivery * * * the fighting war came to an end, the prospect of future availability of rubber was altered, and any loss from change in conditions in that period may well fall upon the party whose unexcused delay prevented prompt . delivery on the final demand." We agree that the delivery was too late.

■ The Seller answers that in any event the Buyer accepted the "Refiners" because (1) it "intimated" that it had done so; (2) it had done an "act in relation to them * * * inconsistent with the ownership of the seller" ; and (3) it had without objection retained them for more than "a reasonable time."[2] The supposed intimation was a letter of the Buyer on October 11th, 1945, in which it asked the Seller to confirm to the Buyer's accountants the amount of the Seller's claim against it as of September 30th, 1945; and in which it stated that claim as $25,500; the full purchase-price. It must be conceded that this was a most unhappy statement, vis-à-vis the Buyer, for, taken at its face, it surely presupposed acceptance of the "Refiners." Nor would it be any excuse that the Buyer's practise was to charge itself upon its books with the cost of goods as soon as they were delivered, and by way of precaution to check its figures with those with whom it dealt. Nevertheless, although the Buyer could not excuse the letter by any undisclosed practice or intent of its own, and although judged

by itself it might have constituted an "intimation" of acceptance, we think that, when it is read with what had passed between the parties before it was written, it is not susceptible of that understanding. These were the facts. After the Seller had delivered the first two "Refiners" in August, 1943, the Buyer on October 1st, 1943, complained that the Seller had billed it for four machines, although it had delivered only two, and asked for "corrected invoices covering only the portion you have shipped." A year later, on October 24th, 1944, after the Seller had on September 2d, 1944, made it clear that it was going on with the contract, in a letter in precisely the same terms, mutatis mutandis, as the letter of October 11th, 1945, the Buyer asked the Seller to confirm the charge in its favor on the Buyer's books of $15,500, the price of the first two "Refiners." While matters stood in this posture it could be argued with considerable plausibility that the contract had been severed, or "split," into two contracts, each for two machines, and that the letter of October 24th, 1944, was an acceptance of the first two. However, it soon transpired, if it was not already known, that the Buyer had no such intent, and that not only did the contract remain single as it had been at the start; but that the inquiry of October 24th, 1944, was not an acceptance of anything, but had been made because of the way the Buyer kept its books. Hence, when the Seller received the letter of October 11th, 1945, couched in the same terms, it had no warrant for assuming that its meaning was different from its predecessor of a year before.

■ Besides, the issue is irrelevant for another reason. It does not appear whether the telephone talk in which the Buyer repudiated the contract was before or after October 11th, 1945. If the letter was after the talk, it would not have affected the rights of the parties because, however broadly one may construe it, it certainly could not be understood as a retraction of the express repudiation; only in case it came before the talk, could it be deemed an acceptance. If the Seller had

2. § 48, Uniform Sales Act; § 4668, General Statutes of Connecticut, Revision of 1930.

the burden of proof, it failed, for the issue remains undecided; and it is plain that it did have the burden, for the delivery, being too late, had to be excused by showing that some conduct of the Buyer condoned it.

■ Second, as an act inconsistent with its "ownership," the Seller puts forward the Buyer's write-off on its books—as a loss deductible from its income tax—of a depreciation in value of the "Refiners." Whether this was done before or after the telephone talk, also does not appear; and, as in the case of the letter of October 11th, 1945, the question is irrelevant for that reason; but it is insufficient on the merits as well. It is of course true that, as an indication of the Buyer's state of mind, the entry was unequivocal, and could not be reconciled with any other conclusion than that the Buyer regarded the machines as its own—unless it was preparing a fraud on the Treasury which is not to be presumed. Yet that did not make the entry an act "inconsistent" with the rights of the Seller, as we understand that word in the statute. It is true that two decisions of the intermediate court of appeals of Illinois [3] have held that it is an acceptance for a buyer to collect insurance on the delivered goods, and it may be that that is a sufficient act of dominion. At any rate it is not the same as the Buyer's conduct here. The decisions are not very helpful; for the most part they concern situations where the buyer has done something to the goods themselves, which would be an invasion of some interest of the seller, although apparently it is enough to offer them for sale, since that asserts a right to dispose of them.[4] Be that as it may, it does not interfere with a seller's ownership to make an entry upon the buyer's books that the goods are the buyer's. Nor would it be so, though the buyer were to claim a deduction for depreciation in his income tax return, or were even to succeed in getting the claim allowed.

■ A much more doubtful question arises from the Buyer's use of the motor and its accessories which began on February 20th, 1946. Had that been before the telephone talk, instead of four months later, it would have brought the situation strictly within the Act; but it does not follow that the result is the same when the use follows an unequivocal rejection of all the goods. In the case at bar the use of the motor was no basis for inferring that the Buyer in fact meant to retract its rejection and to accept the goods; and that is true whether we regard as controlling the private intent of the Buyer, or the assumed intent of a "reasonable" buyer in his circumstances. If use of the motor is to be treated as an acceptance, it is not because the Buyer so intended, but because otherwise the use was an unlawful invasion of the Seller's rights. In Connecticut two decisions [5] have dealt with situations which, though closely akin, did not involve the point. The buyer had received the goods, had found them unsatisfactory, but had continued to use a part of them—all before he rejected them as eventually he did. In such cases the use of the goods is merely one circumstance—perhaps enough in itself—among those facts which together constitute acceptance. However, in Modern Home Utilities, Inc. v. Garrity,[6] although the buyer had rejected a beer cooling apparatus as not in conformity with the contract, she continued to make use of one part of it—a beer pump—and she was held for the price of the whole apparatus. This was on two grounds: that her original rejection was in any event unjustified; and, as an alternate, that, even if it had not been, the rejection made her a bailee, and, "if she used the equipment or a part of it she ceased to be bailee and made that part her own and could not claim rescission."

3. Telford v. Albro, 60 Ill.App. 359; Foley & Co. v. Excelsior Stove & Mfg. Co., 265 Ill.App. 78.

4. Ostman v. Lee, 91 Conn. 731, 101 A. 23; Lilly White v. Devereux, 15 Meeson & Welsly, 285; Brown v. Foster, 108 N.Y. 387, 393, 15 N.E. 608; Eagle Manufacturing Co. v. Arkell & Douglas, Inc., 197 App.Div. 788, 189 N.Y.S. 140.

5. Thompson Machines & Supply Co. v. Graves, 91 Conn. 71, 98 A. 331; Loveland v. Aymett's Auto Arcade, Inc., 121 Conn. 231, 184 A. 376.

6. 121 Conn. 651, 186 A. 639.

The contract being indivisible, the buyer "had no right to accept one part and to reject the rest." It must be owned that, if this is to be understood to lay down an absolute doctrine, the Buyer's use of the motor in the case at bar constituted a retraction of its rejection.

The Uniform Sales Act [7] has somewhat modified the consequences of a buyer's acceptance of any part of the goods [8]; and we are disposed to believe that there may be situations, in which the buyer's eventual use of a part, even though it may be strictly a violation of his duties as bailee, will not impose upon him in invitum a retraction of an earlier rejection. In the case at bar any other result would be to the last degree harsh; for, as has already appeared, the Seller had delayed delivery until the "Refiners" had lost the greater part of their value anyway; and after the Buyer had unequivocally rejected them the Seller had allowed them to lie unclaimed for four months. When the Buyer finally did use the motor, it was not for its intended purpose, but in salvage of what would otherwise have been a total loss. Finally, the Seller's indifference for the four months, although it may not have altogether justified the inference that it had abandoned the property, at least gave some color for that conclusion. Considering that the retraction of a buyer's rejection is not derived from his consent, but is a legal duty imposed upon him as a consequence of the wrong of meddling with goods of which he is only a bailee, we hold that in the circumstances at bar that consequence should not follow. To impose a liability of $25,500 for goods which had certainly by February 20th, 1946, become substantially valueless, seems to us to impose a penalty.

■ Third, is the question whether the Buyer should have allowed the "Refiners" to remain in its possession for a month "without intimating" that it had "rejected them." We limit the time to a month because, as we have said, the Seller had the burden, because the "Refiners" were delivered at least not before the end of August, and because the repudiation may have been at the beginning of October. On the whole we are disposed to agree with the judge that the Buyer's delay in declaring its position did not prejudice, and could not have prejudiced, the Seller, because, the prime market for the "Refiners" having already gone when delivery was made, with it disappeared any immediate call upon the Buyer to declare itself. We hold therefore that the Seller failed to excuse its breach under any of the three statutory grounds for imputing acceptance to the Buyer. The dismissal of its complaint upon the contract was correct.

■ Upon the Seller's appeal there remains only the question whether it was entitled to interest upon the value of the motor and its accessories, which the judge denied. The Buyer's use of this property was indeed a conversion, for which the Seller might sue in quasi-contract, as it did; and the judge found that the motor, although it was secondhand machinery originally, had a "fair market value of $4,590." We follow the law of Connecticut upon the point, and we read Regan v. New York & New England R. Co.[9] and Healy v. Fallon [10] as establishing the principle that, when the value of goods can be "ascertained with reasonable certainty as of a definite time," interest should be recovered. Hence we hold that the Seller should have been awarded interest on the value of the motor and its accessories from the date of the Buyer's appropriation—February 20th, 1946.

■ Coming next to the Buyer's appeal, it does not claim any loss of profit, but it does claim the expenses which it incurred in reliance upon the Seller's promise. These were of three kinds: its whole investment in its "reclaim department," $118,478; the cost of its "rubber scrap," $27,555.63; the cost of the foundation which it laid for the "Refiners," $3,000. The judge in his opinion held that the Buyer had not proved that "the lack of production" of the

---

7. § 44, subd. 3.

8. Portfolio v. Rubin, 233 N.Y. 439, 135 N.E. 843.

9. 60 Conn. 124, 22 A. 503, 25 Am.St.Rep. 306.

10. 69 Conn. 228, 37 A. 495.

reclaim department "was caused by the delay in delivery of plaintiffs' refiners"; but that that was "only one of several possible causes. Such a possibility is not sufficient proof of causation to impose liability on the plaintiffs for the cost of all machinery and supplies for the reclaim department." The record certainly would not warrant our holding that this holding was "clearly erroneous"; indeed, the evidence preponderates in its favor. The Buyer disposed of all its "scrap rubber" in April and May, 1945; and, so far as appears, until it filed its counterclaim in May, 1947, it never suggested that the failure to deliver two of the four "Refiners" was the cause of the collapse of its "reclaim department." The counterclaim for these items has every appearance of being an afterthought, which can scarcely have been put forward with any hope of success.

The claim for the cost of the foundation which the Buyer built for the "Refiners," stands upon a different footing. Normally a promisee's damages for breach of contract are the value of the promised performance, less his outlay, which includes, not only what he must pay to the promisor, but any expenses necessary to prepare for the performance; and in the case at bar the cost of the foundation was such an expense. The sum which would restore the Buyer to the position it would have been in, had the Seller performed, would therefore be the prospective net earnings of the "Refiners" while they were used (together with any value they might have as scrap after they were discarded), less their price—$25,500—together with $3,000, the cost of installing them. The Buyer did not indeed prove the net earnings of the "Refiners" or their scrap value; but it asserts that it is nonetheless entitled to recover the cost of the foundation upon the theory that what it expended in reliance upon the Seller's performance was a recoverable loss. In cases where the venture would have proved profitable to the promisee, there is no reason why he should not recover his expenses. On the other hand, on those occasions in which the performance would not have covered the promisee's outlay, such a result imposes the risk of the promisee's contract upon the promisor. We cannot agree that the promisor's default in performance should under this guise make him an insurer of the promisee's venture; yet it does not follow that the breach should not throw upon him the duty of showing that the value of the performance would in fact have been less than the promisee's outlay. It is often very hard to learn what the value of the performance would have been; and it is a common expedient, and a just one, in such situations to put the peril of the answer upon that party who by his wrong has made the issue relevant to the rights of the other.[11] On principle therefore the proper solution would seem to be that the promisee may recover his outlay in preparation for the performance, subject to the privilege of the promisor to reduce it by as much as he can show that the promisee would have lost, if the contract had been performed.

The decisions leave much to be desired. There is language in United States v. Behan[12] which, read literally, would allow the promisee to recover his outlay in all cases: the promisor is said to be "estopped" to deny that the value of the performance would not equal it. We doubt whether the Supreme Court would today accept the explanation, although the result was right under the rule which we propose. Moreover, in spite of the authority properly accorded to any decision of that court, we are here concerned only with Connecticut law; and the decisions in that state do not seem to be in entire accord. In the early case of Bush v. Canfield[13] the buyer sued to recover a payment of $5,000 made in advance for the purchase of 2,000 barrels of flour at $7.00 a barrel. Although at the time set for delivery the value of the flour had fallen to $5.50, the seller for some undisclosed reason failed to perform. The action was on the case for the breach, not in indebi-

---

11. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544.

12. 110 U.S. 338, 345, 346, 4 S.Ct. 81, 28 L.Ed. 168.

13. 2 Conn. 485.

190

tatus assumpsit, and the court, Hosmer, J., dissenting, allowed the buyer to recover the full amount of his payment over the seller's objection that recovery should be reduced by the buyer's loss. The chief justice gave the following reason for his decision which we take to be that of the court, 2 Conn. page 488: "The defendant has violated his contract; and it is not for him to say that if he had fulfilled it, the plaintiffs would have sustained a great loss, and that this ought to be deducted from the money advanced." If there is no difference between the recovery of money received by a promisor who later defaults, and a promisee's outlay preparatory to performance, this decision is in the Buyer's favor. However, when the promisor has received any benefit, the promisee's recovery always depends upon whether the promisor has been "unjustly enriched"; and, judged by that nebulous standard, there may be a distinction between imposing the promisee's loss on the promisor by compelling him to disgorge what he has received and compelling him to pay what he never has received. It is quite true that the only difference is between allowing the promisee to recover what he has paid to the promisor and what he has paid to others; but many persons would probably think that difference vital.

In any event, unless this be a valid distinction, it appears to us that Santoro v. Mack [14] must be read as taking the opposite view. The plaintiff, the vendee under a contract for the sale of land, had paid an electrician and an architect whom he had employed in reliance upon the promised conveyance. These payments he sought to recover, and was unsuccessful on the ground that they had not benefited the vendor, and that they had been incurred without the vendor's knowledge or consent. Yet it would seem that such expenses were as much in reasonable preparation for the use of the land, as the cost of the foundation was for the use of the "Refiners." The point now before us was apparently not raised, but the decision, as it stands, seems to deny any recovery whatever. Three other Connecticut decisions—the only ones which at all approach the question—do not throw any light upon the point.[15]

The result is equally inconclusive if we consider the few decisions in other jurisdictions. The New Jersey Court of Errors and Appeals in Holt v. United Security Life Insurance & Trust Co.[16] recognized as the proper rule that, although the promisor had the burden of proving that the value of the performance was less than the promisee's outlay, if he succeeded in doing so, the recovery would be correspondingly limited. In Bernstein v. Meech [17] the promisee recovered his full outlay, and no limitation upon it appears to have been recognized, as may be inferred from the following sentence: "It cannot be assumed that any part of this loss would have been sustained by the plaintiff if he had been permitted to perform his contract." In Reynolds v. Levi [18] the promisee was a well digger, who had made three unsuccessful efforts to reach water, and the promisor— a farmer—stopped him before he had completed his fourth. The court limited the recovery to the amount earned on the fourth attempt, but for reasons that are not apparent. It appears to us therefore that the reported decisions leave it open to us to adopt the rule we have stated. Moreover, there is support for this result in the writings of scholars. The Restatement of Contracts [19] allows recovery of the promisee's outlay "in necessary preparation" for the performance, subject to several limitations, of which one is that the promisor may deduct whatever he can prove the promisee would have lost, if the contract had been fully performed. Professor McCormick

14. 108 Conn. 683, 145 A. 273.

15. Edward DeV. Tompkins, Inc., v. City of Bridgeport, 94 Conn. 659, 110 A. 183, 191; Kastner v. Beacon Oil Co., 114 Conn. 190, 158 A. 214, 81 A.L.R. 97; Jordan v. Patterson, 67 Conn. 473, 35 A. 521.

16. 76 N.J.L. 585, 72 A. 301, 21 L.R.A., N.S., 691;

17. 130 N.Y. 354, 360, 29 N.E. 255, 257;

18. 122 Mich. 115, 80 N.W. 999.

19. § 333 (d).

thinks [20] that "the jury should be instructed not to go beyond the probable yield" of the performance to the promisee, but he does not consider the burden of proof. Much the fullest discussion of the whole subject is Professor Fuller's in the Yale Law Journal.[21] The situation at bar was among those which he calls cases of "essential reliance," and for which he favors the rule we are adopting. It is one instance of his "very simple formula: We will not in a suit for reimbursement of losses incurred in reliance on a contract knowingly put the plaintiff in a better position than he would have occupied, had the contract been fully performed."

The judgment will therefore be affirmed with the following modifications. To the allowance for the motor and accessories will be added interest from February 20th, 1946. The Buyer will be allowed to set off $3,000 against the Seller's recovery with interest from October, 1945, subject to the Seller's privilege to deduct from that amount any sum which upon a further hearing it can prove would have been the Buyer's loss upon the contract, had the "Refiners" been delivered on or before May 1st, 1945.

Judgment modified as above, and affirmed as so modified.

20. McCormick on Damages, § 142, p. 584.

21. 46 Yale Law Journal, 752, pp. 75–80.