ROYCE CHEMICAL COMPANY,
Plaintiff-Appellee,

v.

SHARPLES CORPORATION, Defendant-
Appellant.

No. 32, Docket 25656.

United States Court of Appeals
Second Circuit.

Argued Oct. 4, 1960.

Decided Dec. 6, 1960.

Rehearing Denied Jan. 24, 1961.

184

Inzer B. Wyatt, New York City (Sullivan & Cromwell and Marvin Schwartz, New York City, Richard Sexton, Brooklyn, N. Y., on the brief), for appellant.

Edward D. Burns, New York City (Saxe, Bacon & O'Shea, New York City, on the brief), for appellee.

Before HINCKS, WATERMAN and MOORE, Circuit Judges.

HINCKS, Circuit Judge.

This is a diversity case in which the plaintiff-appellee, a New Jersey corporation, to whom we shall refer as the Buyer, is a manufacturer of sodium hydrosulfite, a chemical used principally in the textile industry to make vat dyes soluble. Defendant-appellant, to whom we shall refer as the Seller, is a Delaware corporation which manufactures centrifugal equipment, including the "Super-D-Hydrator" which is used for crystal separation in the production of chemicals.

The first step in the Buyer's process of manufacturing sodium hydrosulfite is the combination of zinc dust with sulfur dioxide to make zinc hydrosulfite. To this is added soda ash or caustic soda and the resulting mixture is put through filter presses to filter off the zinc. The resulting "liquor" is then pumped into a "salting out tank," where salt is added and crystals of sodium hydrosulfite are precipitated out of solution. When formed, these crystals are suspended in the liquor; the mixture of liquor and crystals is called "slurry."

The next step, viz., the separation of the crystals from the slurry, is the one with which we are principally concerned. Before the events which culminated in this litigation, the Buyer separated the crystals by the traditional filter crock, or Nutsche, process. In this process, the slurry is put in a filter crock and is pulled by a vacuum through the filter, which, like a tea strainer, allows the liquor to pass but retains the crystals.

An alternative to the Nutsche process, now being used, apparently successfully, in the manufacture of sodium hydrosulfite by the DuPont Company, is the separation of crystals from liquor by centrifugal force. This is done by introducing the slurry into the revolving basket of a centrifugal machine. The outer wall of such a basket is perforated and as it revolves centrifugal force causes the liquor to pass through the holes, leaving the crystals behind in a cake on the outer wall. A knife is then applied to the cake as the basket revolves and the crystals are then unloaded.

Beginning in 1947, various discussions took place between the Buyer and the Seller, with a view towards the purchase by the Buyer of a centrifugal machine. Through 1951, the Seller, principally through its agent Costigan, a law-trained engineer, conducted a vigorous campaign to interest the Buyer in its machine. Various statements made by the Seller in the course of this campaign will be alluded to later in this opinion as they become relevant to our discussion. On January 17, 1951, Costigan wrote to the Buyer as follows:

"It was a pleasure to talk with you again and learn of your renewed interest in the production of sodium hydrosulfite. Since our several discussions with you a few years ago, we have had more very successful experience with this production and can vouch for the suitability of the Sharples C–20 Vaportite Super-D-Hydrator on this job."

Accompanying this letter was a "proposal" quoting prices for the two available sizes of the Super-D-Hydrator. There was a place on this "proposal" form for an acceptance, which the Buyer did not execute; even acceptance of the "proposal" would not, by its terms, create a contract until approved by one of the Seller's high-ranking officers, an act never performed. On January 26, 1951, the Buyer sent its "purchase order" for a C–27 centrifugal machine, which the Seller acknowledged on January 30, 1951.

The machine which the Seller accordingly delivered and the Buyer paid for, did not work satisfactorily, presumably because the crystals formed in the salting out tank, although varying in size, were too fine to withstand the force involved in separation by the Super-D-Hydrator, resulting in an excessive amount of crystal breakage. After various attempts to make adjustments which would render the machine usable, in which the Seller participated, the Buyer, through counsel, wrote to the Seller:

"we * * * rescind the sale and ask that you take immediate steps to reimburse us for the cost of the machine, plus our costs of the installation, which are substantial, and take the machine back."

The Seller refused.

Eventually the Buyer brought this action, seeking damages for breaches of express and implied warranties and for misrepresentations. The court below, sitting without a jury, found liability under all three theories, going beyond the complaint in finding that the alleged misrep-

resentations amounted to "fraud," and awarded to the Buyer damages of $32,-749.05, plus interest. The Seller appeals.

■ Under Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, we are obliged to apply the conflict of laws principles of New York, the state in which the district court sat. We agree with that court that under New York's conflicts rules, Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246, the law of New Jersey is applicable here.

1. *Liability*

■■ Since we agree with the court below that the Seller is liable because of breach of an express warranty, we deem it unnecessary to review the lower court's treatment of the implied-warranty and misrepresentation claims and expressly refrain from discussion thereof.[1]

New Jersey Statutes § 46:30–18 (corresponding to Uniform Sales Act § 12) provides:

> "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon."

The district court found an express warranty in a bulletin which states that among the conditions which the Super-D-Hydrator can handle is that which exists when "because of evaporator operation the size of the crystals may vary from comparatively fine mesh to relatively large crystals from load to load or in the same load." The Seller has convinced us of the error of this finding: this statement could not have been relied upon nor would its natural tendency be to induce a sale since the Buyer knew that there was no "evaporator operation" in its process.

But the principal express warranty found by the court below was the statement in Costigan's letter of January 17, 1951, which "vouched" for the suitability of the Super-D-Hydrator "on this job." [2] We have no doubt that the natural tendency of this statement, which is quoted above, is to induce a sale. And we agree with the district court that this statement was an affirmation of fact—that the machine was suitable for the Buyer's use —and not a mere statement of opinion. If the Buyer "relied" on it, therefore, it is an actionable express warranty under the New Jersey statute. The court below specifically found that the proof established reliance. And that finding we may reverse only if it is "clearly erroneous," Fed.Rules Civ.Proc. 52(a), 28 U.S.C.A., which it is not.

The Seller bases its argument that Costigan's statement was not a warranty on the theory that "this production" refers to the use of the Super-D-Hydrator at DuPont, where the "very successful experience" had taken place, and that "this job" likewise refers to DuPont. In context, this is untenable; it is quite clear that "this production" refers back generally to the "production of sodium hydrosulfite" and that when the Seller said "we * * * can vouch for the suitability of [our machine] *on this job*" it meant *on the Buyer's job.* It seems scarcely sensible to infer that in a letter to the Buyer the Seller would "vouch for" the suitability of the machine in Du-Pont's process.

■ The Seller also argues that its "proposal" and the Buyer's "purchase

---

1. Judge Moore believes that there is no adequate factual support for a finding of fraudulent misrepresentations in connection with the sale.

2. In terms this statement referred to the C-20 model, and it was a C-27 which was sold. This has no legal consequences, however, as the Seller seems willing to concede; the C-27 is the same type of machine as the C-20, except that it has a greater capacity.

The letter of January 17, 1951 also said:

"The centrifuge as proposed to you includes extra valves, rinse tubes and controls, which our experience has indicated are necessary to make this perform to your entire satisfaction."

order" constitute the entire contract of sale and, therefore, that the parol evidence rule bars the admission of the letter of January 17th. But since acceptance of the "proposal" would not have resulted in a contract until approved by one of the Buyer's officers, it cannot be said that both parties unconditionally assented to the "proposal" and "purchase order" as the complete and accurate integration of their contract. See Professor Corbin's statement of the parol evidence rule in volume 3 of his work on Contracts, at page 357.

The Seller, in a learned and detailed brief and argument, makes numerous other claims of error. But the rulings below thus challenged, even if erroneous, do not affect our holding. Thus, the district court wrote that "the Super-D was not suitable for the commercial production of sodium hydrosulfite." If by this, the judge below meant that the "Super-D" is never suitable for such production, the quoted assertion was wrong. But our holding is not based on the assertion as thus broadly interpreted. Rather, our holding is bottomed upon the proofs—of which there was an abundance—that the "Super-D" was not suitable for use in the Buyer's method of production of sodium hydrosulfite. And that restricted interpretation of the statement, we think, is what the judge below meant. For in his opinion immediately following the assertion he said the Seller's "letter of March 18, 1954, admits as much." That letter plainly refers to the use of the "Super-D" in the Buyer's process—not its use generally in the industry.

Similarly, the district court may have been wrong in stating that the Seller could have informed itself of the type of the Buyer's slurry by examining the marketed product. But even so, whether or not the Seller had knowledge of, or access to knowledge of, the Buyer's process is no excuse for its breach of an express warranty. Hindsight perhaps may show that without such knowledge the Seller exercised poor judgment in making such a warranty. But the buyer's right

of recovery is not limited to the breach of warranties wisely made.

2. *Damages*

N.J.Stats. § 46:30–75(6) (corresponding to Uniform Sales Act § 69) provides:

"The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty."

■ The district court awarded the following items of damage:

1. $15,958.00—Difference between purchase price of machine ($28,558) and resale price less broker's commission ($12,600).

2. 6,989.17—Expenses incurred by Buyer in installing machine.

3. 2,623.76—Purchase price and installation costs of certain receiving tanks, otherwise unusable and as yet unmarketable.

4. 2,186.85—Purchase price and installation costs of certain feeding tanks, otherwise unusable and as yet unmarketable.

5. 4,444.55—Purchase price and installation costs of other (conical) feeding tanks, purchased at the Seller's suggestion, otherwise unusable and as yet unmarketable.

6. 546.72—Cost of testing batches of chemicals.

Other claims were disallowed, and as to items 3, 4, and 5 above the district court ordered that on a later sale the proceeds should be paid over to the Seller, less the expenses of the resale. We agree that all these are proper items of damage under the statute above quoted.

The Seller, however, argues that under § 46:30–75 a buyer may not pursue both the remedies of rescission and damages for breach of warranty: it contends that the Buyer's letter demanding reimbursement for the purchase price and costs of installation was a binding election of remedies, preventing it from now seeking damages. Accordingly, it construes the action as one for rescission, and argues that only item 1 is recoverable.

But we think that the Buyer never made a binding election to rescind. An ineffective attempt to rescind is not a binding election, and certainly the Buyer's unheeded demand for reimbursement of the purchase price and installation costs was no more than an ineffective attempt to rescind. St. George v. Grisafe, 38 N.J.Super. 297, 118 A.2d 835. Since the attempted rescission was ineffective, it was not until trial that the Buyer was required to choose between mutually exclusive remedies: a "wronged buyer may be required at trial to choose which alternative he will pursue." Walter E. Heller & Co. v. Hammond Appliance Co., 52 N.J.Super. 332, 145 A.2d 499, 502, modified on other grounds, 29 N.J. 589, 151 A.2d 537; accord, Gerli & Co. v. Mistletoe Silk Mills, 80 N.J.L. 128, 76 A. 335. From our reading of the complaint, we think it clear that the Buyer made that choice in the complaint, and chose damages.

3. *Interest* [3]

We must apply the conflicts rule as would a New York court. We believe that under the "center-of-gravity" theory of Auten v. Auten, supra, the New York courts would apply the law of New Jersey—the state with the most significant contacts—to the question of interest as an item of damage, as well as to other questions relating to the contract's performance. Cf. Restatement, Conflict of Laws §§ 358, 413, 418; Blankenship v. Rountree, 10 Cir., 238 F.2d 500. Under the law of New Jersey, "interest

is not allowed on an unliquidated damage that is not capable of ascertainment by mere computation, for the reason that the person liable does not know what sum he owes; he cannot compute the interest, and therefore he is not in default for not paying." E. Clemens Horst Co. v. Peter Breidt City Brewery, 94 N.J.L. 230, 109 A. 727, 729.

Thus whether interest should have been allowed depends upon whether the claims were liquidated. We think that the only claim that was "liquidated," in the sense that word is used in connection with this problem, was the demand for the price of the machine. Thus interest was correctly awarded on $28,558, the entire cost of the machine, from March 29, 1954, the date of the Seller's refusal to take the machine back, to December 21, 1956, the date the Buyer resold the machine, and on $15,958, the difference between cost and resale price, from March 29, 1954 down to the date of judgment. But the other items of damage, principally "reliance" damage, cf. L. Albert & Sons v. Armstrong Rubber Co., 2 Cir., 178 F.2d 182, 17 A.L.R.2d 1289, were, we think, unliquidated until the judge made his findings. Accordingly, the judgment must be remanded for a modification as to interest, and as so modified the judgment will be affirmed.

Remanded for modification as to interest; affirmed as to liability and damages.

On Petition for Rehearing

PER CURIAM.

On reconsideration of our rulings on the interest allowed below, as stated in the last paragraph of our opinion of December 6, 1960, we adhere to our ruling that interest was properly allowed on $28,558 from March 29, 1954 to December 21, 1956; for that period as a result of the seller's breach the buyer was wrongfully deprived of the benefits for which it had paid that sum (the purchase

---

3. The awarding of interest in breach-of-warranty cases is unusual, but not unknown. For a recent example with an interesting fact situation, see Blustein v. Eugene Sobel Co., 105 U.S.App.D.C. 32, 263 F.2d 478.

price). And interest on $15,958, the difference between the original purchase price and the resale price, was properly allowed below *from December 21, 1956* to date of judgment. Our opinion which stated that this second component of the proper interest charge should run *from March 29, 1954* is corrected accordingly. Thus computed, we think the allowance accords with New Jersey law. Cf. Second Nat. Bank v. Columbia Trust Co., 3 Cir., 288 F. 17, 22, 30 A.L.R. 1299.

Except for the correction just above specified, we adhere to our earlier rulings and with that exception the petition for rehearing is denied.