626 P.2d 147

Albert Leroy BURKETT,
Plaintiff/Appellee,

v.

Alfonso H. MORALES,
Defendant/Appellant.

No. 2 CA–CIV 3739.

Court of Appeals of Arizona,
Division 2.

Feb. 20, 1981.

Slutes, Browning, Zlaket & Sakrison, P. C. by D. Thompson Slutes and Jane L. Eikleberry, Tucson, for plaintiff/appellee.

Michael M. Moore, Tucson, for defendant/appellant.

OPINION

HOWARD, Judge.

The issue here is whether the evidence supports the trial court's conclusion that no contract existed between the parties.

Although there is conflicting evidence, we shall consider it in the light most favorable to upholding the judgment. *Gann v. Morris,* 122 Ariz. 517, 596 P.2d 43 (App. 1979). Appellee Burkett is the inventor of the "Burkett mill", a machine which compacts, shreds, grinds and deodorizes garbage. It also purifies sewage water. He holds several United States patents and a patent pending on this invention.

Appellant, Alfonso Morales, an engineer with some experience in solid waste management, became interested in the mill. Burkett had started to build a demonstration model at the City of Tucson's sewage treatment facility. Morales met with Burkett and they discussed the licensing by Morales of Burkett's patent rights to the mill. Morales drafted a five-page document entitled "Burkett Mill Agreement". Some paragraphs of the document were typed

and some were in longhand. The portions in longhand were written on a legal pad; the typed portions were cut from a typed document and fastened on the pad. Each page was then reproduced by a photocopying machine. On November 13, 1975, the parties signed the document and they initialed each page. This document was a memorandum for a subsequent agreement which was to be drafted by Burkett's lawyer, Michael Brown, and according to Burkett, it was not intended that the document be the contract between the parties. It gave Morales a 15-year license to manufacture, distribute and sell the Burkett mill in return for 10% of the gross receipts until Burkett received $250,000 at which time the royalty was to be reduced to 7%. It also provided that Burkett was to serve as a consultant to Morales for the sum of $2,000 per month payable as long as Burkett served in that capacity.

Within three or four days of the signing of this document, Morales paid Burkett $3,100 which Burkett owed to Southwestern Industries which was building the demonstration mill for the City of Tucson. The document of November 13, 1975, did not mention this sum nor did it require that it be paid by Morales, but the parties knew that it would have to be paid in order for Morales to complete the building of the machine.

On November 20, 1975, Burkett took the November 13 document to Michael Brown who understood it to be a memorandum outlining an agreement which Morales and Burkett would ultimately enter into. Brown met with Burkett and Morales and they discussed the proposed agreement. These discussions disclose that there was a difference between what was contained in the November 13 document and what the parties wanted in the agreement that Brown would draft. Under the terms of the November 13 document Burkett could have been terminated by Morales at any time as a consultant, thereby relieving Morales of the requirement to pay him the $2,000 per month. However, Morales agreed in front of Brown that he intended the $2,000 to be paid each and every month throughout the lifetime of the license regardless of whether Burkett actively acted as a consultant.

After meeting with the parties, Brown drafted a contract which was in accordance with these discussions. It included a provision that the $2,000 was to be paid for the term of the license but was to be reduced when royalties were received. This payment schedule differed from the one set forth in the November 13 document.

After drafting the contract Brown had discussions and negotiations over a period of eight to nine months with Morales who eventually refused to sign it, telling Brown that he was happy with the agreement of November 13 which he had drafted. During the time that these negotiations were taking place, Morales paid Burkett $2,000 per month although during most of that period Burkett was in the hospital or convalescing at home as a result of a brain tumor and was unable to act as a consultant.

When he got the first check from Morales in December 1975, Burkett told his lawyer to return it to Morales because Morales had not signed the contract but, according to Burkett, Brown told him to keep the money because Brown had an agreement with Morales whereby Morales agreed to all the terms and was going to sign the contract. Burkett received a total of $20,000 from Morales before the payments stopped.

Morales completed the demonstration mill and built and sold four mills for which he received a total of $58,000. During this time Burkett tried to stop Morales from representing that Morales had any interest in the mill or patents.

In 1978 Burkett filed an action for declaratory relief and damages. Morales answered and counterclaimed for injunctive relief and damages. The case was tried to the court sitting without a jury. It declared that no contract existed between the parties and ordered that each party's damages be set off against the other so that neither party was awarded damages.

The law governing this case is clear. A document which purports to be a contract is not proof of its own character and validity. In every case it is a question of fact whether the parties adopted a writing as their agreement and it may always be shown by parol that a writing, however complete on its face, was never executed or delivered as a contract. *Hall v. Humphrey-Lake Corporation*, 29 Ill.App.3d 956, 331 N.E.2d 365 (1975); 4 Williston on Contracts (3rd Ed.) Sec. 634; 3 Corbin on Contracts, Sec. 577 and see *United States Fidelity & G. v. Olds Bros. Lumber Co.*, 102 Ariz. 366, 430 P.2d 128 (1967) and *Mach v. Coker*, 22 Ariz. App. 105, 523 P.2d 1342 (1974).

In *Gordy v. Ocean Park*, 218 Md. 52, 145 A.2d 273 (1958) there was a duly written "agreement". There was also testimony that the document was considered to be a memorandum preliminary to the lawyers' negotiating the details and drafting a more formal contract. The appellate court affirmed the trial court's finding that the first agreement was not intended by the parties to be a contract and stated that the question of whether the parties intended the document to be a contract between them was a question of fact for the jury. Corbin observes that in such situations:

> "Without doubt, the form of the instrument tends to corroborate the plaintiff. [The one asserting the instrument was a binding contract.] Surrounding circumstances and the conduct of the parties should be given due consideration. The finding of the trial court, with or without a jury, should seldom be set aside by an appellate court." 3 Corbin on Contracts, Sec. 577.

Whether the parties intend to be bound only after the execution of a formal written agreement is a question of fact. *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*, 541 F.2d 584 (6th Cir. 1976); 1 Corbin on Contracts, Sec. 30. Of course, sometimes the facts will permit only one inference to be drawn and the issue becomes a question of law. That is not the case here, however, and the facts support the trial court's conclusion.

Appellant has presented us with an additional issue which deals with the court's disposition of the damage claims. Since he has cited no authority in support of his argument, it shall not be considered. *Mobilife Corporation v. Delta Investment Corporation*, 121 Ariz. 586, 592 P.2d 782 (App. 1979).

Affirmed.

HATHAWAY, C. J., and BIRDSALL, J., concur.