783 P.2d 822

**Thomas KOENEN, Plaintiff/Appellee,**

v.

**ROYAL BUICK COMPANY,**
**Defendant/Appellant.**

**No. 2 CA–CV 89–0086.**

Court of Appeals of Arizona,
Division 2, Department A.

Nov. 14, 1989.

Schwanbeck, Lane & Present by Victor R. Schwanbeck, Tucson, for plaintiff/appellee.

Mendelsohn, Oseran, Mance & Eisner, P.C. by Richard S. Oseran, Tucson, for defendant/appellant.

ROLL, Judge.

Defendant Royal Buick Company (Royal Buick) appeals from a judgment entered in favor of Thomas Koenen in connection with an alleged breach of contract involving a limited edition automobile. Because sufficient evidence was presented that Koenen entered into a contract with Royal Buick and that Royal Buick breached that contract, we affirm.

## FACTS

In September 1986, Thomas Koenen learned from automobile literature that General Motors planned to manufacture 500 special editions of the Buick Regal Grand National automobile. The vehicle, dubbed the Grand National Experimental (GNX) was the quickest limited production car in the United States at that time. The GNX, like the Grand National, was available only in black and had a 3.8 turbo-

charged fuel-injected hand-built motor. The GNX, however, had additional features including an intercooled turbo-charged V–6 engine with special body, special tires and suspension, and special wheels. The GNX was featured on the cover of *Autoweek* and *Popular Mechanics*.[1]

Several months before Royal Buick, a Tucson–based automobile dealership, received official notification that it would receive one of the 500 GNX autos, Koenen contacted salesperson William Yalen at Royal Buick. Koenan, along with his father and brother, collected cars under the name of Koenen Classic Cars. Their collection was stored in an air-conditioned California warehouse. Koenen had previously conducted transactions with Royal Buick and Yalen. In March 1986, Koenen purchased a 1986 Grand National from Royal Buick for cash. Yalen was the salesperson. In August 1986, Koenen purchased a 1987 Grand National through Yalen from Royal Buick for cash.

In November 1986, Koenen went to Yalen and told him that he wished to buy a GNX. Koenen showed Yalen current literature regarding Buick's plan to offer a limited number of this special edition. During discussions with Yalen and new car sales manager Robert Sagar, Koenen agreed to pay the window sticker price for the vehicle, that is, the price placed on the car at the factory.[2]

In December 1986, Royal Buick General Manager Tom Bird orally agreed to sell the GNX to Gary Gerovac. No purchase order was completed, however. On January 5, 1987, Jeff Buchner signed a purchase order agreement to purchase a GNX from Royal Buick. Although Buchner offered to give Royal Buick a $1000 deposit in connection with the purchase order, he was told that a $100 deposit was satisfactory. At that time, sales manager Sagar assured Buchner that he was "first in line."

On February 16, 1987, a purchase order form was signed by Koenen, Yalen, and Sagar regarding the GNX. The document contained the notation:

> Order is not binding on Seller until accepted in writing by officer, or Sales-manager of Seller, and until Purchaser's credit has been approved.

The purchase order also contained the notation "Price and Availability To Be Determined?" Koenen was listed on the form as the purchaser. Koenen told Sagar and Yalen that he was willing to pay up to $30,000 if that was the sticker price. Sagar and Yalen told Koenen that no one else had made a deposit and that Koenen was number one to receive a GNX. Koenen gave Yalen a check for $500 as a deposit for the GNX but asked that the check not be cashed. On February 17, 1987, Royal Buick filled out a purchase order form for David Woon and accepted a $500 deposit from him for purchase of the GNX. On February 20, 1987, Koenen replaced the February 16, 1987·check with a $500 check from his father.

In a letter dated April 21, 1987, General Motors notified Royal Buick that it would receive one GNX. The window sticker price for the vehicle was $29,290. Royal Buick General Manager Tom Bird placed a market value of $44,900 on the vehicle. Yalen contacted Koenen to see if Koenen wanted to bid on the vehicle.

On May 8, 1987, Royal Buick returned the deposits to Koenen, Buchner, and Woon. When Buchner received the letter, he contacted Sagar to protest. Sagar asked Buchner if he would be interested in bidding on the vehicle. Royal Buick received the GNX in September 1987. Royal Buick placed a price of $44,900 on the vehicle. Bird testified as to the process by which he arrived at the $44,900 figure:

> Q Who came up with the price?
>
> A I did.
>
> Q And how did you come up with that price?
>
> A In doing a little search as to what the cars were bringing around the coun-

---

1. Mandel, "Speedway Born," *Autoweek,* Feb. 16, 1987, at 63; Allen, "Speed Thrills," *Popular Mechanics,* March 1987, at 63.

2. This is also referred to as the manufacturer's suggested retail price (MSRP).

try, that that [sic] seemed to be somewhat of a mean figure.

Q  About $45,000?

A  Right.  We wanted to be a little cheaper than anybody else, so we cut it down a hundred dollars.

Q  Four hundred?

A  Forty–four nine.

Q  Forty–four nine?

A  I was being facetious in that last comment, but it was forty-four nine.

In April 1988, Royal Buick sold the vehicle for $39,750 to an Oklahoma physician.

## PROCEDURAL HISTORY

Koenen received Royal Buick's May 8, 1987 letter informing him that he would not be able to purchase the GNX.  The letter included a check in the amount of Koenen's $500 deposit, but Koenen declined to cash the check.  Koenen proceeded to file a civil complaint alleging breach of contract on the part of Royal Buick.  As part of the complaint, Koenen sought a temporary restraining order preventing Royal Buick from selling the GNX.  By stipulation of the parties, Royal Buick agreed not to sell the vehicle.  On November 30, 1987, a preliminary injunction was denied and Royal Buick was permitted to sell the GNX.

Koenen's complaint against Royal Buick was joined with a complaint filed by Buchner, who also sought damages based upon Royal Buick's refusal to sell the GNX to him.[3]

The matter was tried to the court without a jury.  The trial court awarded Koenen and Buchner $15,610 each, representing the difference between the manufacturer's suggested retail price ($29,290) and the fair market value of the automobile ($44,900).[4]

## ISSUES ON APPEAL

On appeal, Royal Buick argues that (1) no enforceable contract was entered between Royal Buick and Koenen, (2) the

purchase order did not satisfy the statute of frauds, (3) parol evidence was improperly admitted to explain the terms of the purchase order, (4) the contract was illegal and void, and (5) Koenen failed to prove the damages awarded by the court.

### Standards of Review

This court must view the evidence and reasonable inferences therefrom in the light most favorable to the prevailing party.  If there is any evidence to support the judgment, we are required to affirm.  *Paul Schoonover, Inc. v. Ram Construction, Inc.,* 129 Ariz. 204, 205, 630 P.2d 27, 28 (1981).  Questions of law are reviewed *de novo.  Tovrea Land & Cattle Co. v. Linsenmeyer,* 100 Ariz. 107, 114, 412 P.2d 47, 52 (1966).

### Enforceability of the Contract

■  Royal Buick argues that no enforceable contract was entered between Koenen and Royal Buick for the sale of the GNX.

Both parties agree that whether the parties intended to enter a contract is a question of fact for the trial court.  *Burkett v. Morales,* 128 Ariz. 417, 419, 626 P.2d 147, 149 (App.1981).

Evidence was presented that the purchase order form furnished by Royal Buick and signed by Koenen, a salesperson, and a sales manager, was the only form used by Royal Buick in connection with orders for the purchase of vehicles.  General Manager Bird testified that the sales personnel used this form as a buyer's order or work order although the form does not contain the notation "work order."  The same form, with identical wording, in a "snap-out" format, is usually typed.  Koenen maintains that although the purchase order contained the notation that it was "not binding on Seller until accepted in writing by officer, or Sales-manager of Seller, and until purchaser's credit has been approved ...," sales manager Sagar did sign Koenen's purchase order and Koenen's credit

---

3.  Koenen's complaint was amended adding allegations of fraud and negligence.

4.  Buchner and Royal Buick have stipulated to dismissal of Royal Buick's appeal as to the judgment in favor of Buchner.

did not need to be approved because, as with the previous two purchases by Koenen, this was to be a cash transaction. Royal Buick maintains that the purchase order was not intended to be a binding contract, that the orders can be rewritten many times, and that customers are not bound by the work order. Royal Buick argues that the work order merely constitutes an offer to buy.

By the very terms of the purchase order, the order is binding on the seller once a sales manager signs the order and the purchaser's credit has been approved. The sales manager signed the purchase order and no discussion occurred regarding a need to approve Koenen's credit, probably because Koenen, as on other occasions, did not intend to purchase the vehicle on credit. The evidence supports the trial court's finding that the purchase order constituted a contract.

### Statute of Frauds

Royal Buick next argues that the purchase order fails to satisfy the requirements of the statute of frauds. A.R.S. § 47-2201(A) provides that:

[A] contract for the sale of goods for the price of five hundred dollars or more is not enforceable ... unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

■ A.R.S. § 47-2201 is identical to § 2-201 of The Uniform Commercial Code (UCC). In interpreting this section of the UCC, we look to other states. This provision has been interpreted to mean that a contract for sale need not contain all material terms and that such material terms as are included need not be precisely stated. The writing need only afford a basis for believing that offered oral evidence rests on a real transaction. *Howard Constr. Co.*

*v. Jeff–Cole Quarries, Inc.*, 669 S.W.2d 221, 227 (Mo.App.1983). This interpretation follows UCC § 2-201, Official Comment One, which states in part:

The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction.... The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted.

■ The statute of frauds does not require that the writing contain the price. Courts have consistently held that the statute of frauds is satisfied so long as the writing evidences a contract for the sale of goods, is signed by the party against whom enforcement is sought, and specifies a quantity. *See, e.g., Alaska Indep. Fishermen's Mktg. Ass'n v. New England Fish Co.*, 15 Wash.App. 154, 157–59, 548 P.2d 348, 351 (1976).

■ Royal Buick argues that because neither price nor availability were set forth in the purchase order and the possibility existed that Royal Buick might not receive a GNX for sale, the agreement contained impermissibly "futuristic" language. *See* J. White & R. Summers, *Uniform Commercial Code* §§ 2-4 (3d ed. 1988); *Conaway v. Twentieth Century Corp.*, 491 Pa. 189, 200–01, 420 A.2d 405, 411 (1980). In *Conaway*, the writings contained the words "plan," "offer," and "tentative stages," and the trial court concluded that the writings were part of ongoing negotiations rather than a contract.

In this case, the purchase order was signed by Koenen and by Yalen and Sager of Royal Buick. The quantity specified was one GNX Regal. In addition, there was sufficient evidence for the trial court to determine that the purchase order indicated that a contract for sale had been created. The purchase order included the

type of vehicle, optional equipment ("loaded"), and noted receipt of a $500 down payment. The purchase order was sufficient to indicate that a contract for sale existed between Koenen and Royal Buick.

### Parol Evidence

Royal Buick next argues that the trial court erred in permitting the introduction of parol evidence to contradict the terms of the purchase agreement.

Under A.R.S. § 47–2202, evidence of the course of dealing between parties may be admitted to explain terms of the written contract. Course of dealing is "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." A.R.S. § 47–1205. Yalen testified that in prior transactions Koenen paid the manufacturer's suggested retail price and paid cash for his Grand Nationals.

Royal Buick admits that the price and availability terms are ambiguous. Where a writing is ambiguous, extrinsic evidence will be admitted to explain it. *Associated Students of the Univ. of Ariz. v. Arizona Board of Regents,* 120 Ariz. 100, 104, 584 P.2d 564, 568 (App.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1226, 59 L.Ed.2d 462 (1979). Royal Buick contends the extrinsic evidence contradicted rather than explained the terms. We disagree.

■ Royal Buick argues that the writing indicates that the price had not been determined. Koenen maintains that the price was arrived at because he offered to pay the manufacturer's suggested retail price and although that price was yet to be determined, the formula was accepted by Royal Buick. We agree.

Yalen testified:

Q What was your understanding? Was your understanding that [Koenen] was going to pay the window sticker price, was it not? I'm talking about your understanding.

A My understanding was the window sticker price.

Royal Buick also argues that the contract was vague because it was not known at the time the contract was executed whether a GNX would even be available. Koenen suggests that the only question as to availability was whether Royal Buick would receive a GNX automobile to sell to Koenen. We agree that this is the only reasonable interpretation to be placed upon this term contained on the purchase order. The receipt of the GNX then becomes a condition to Royal Buick's duty to perform.[5]

### Legality of Contract

■ Royal Buick next argues that the contract for the sale of the car was void because Koenen planned on transporting the vehicle to California in violation of California Health and Safety Code § 43151(a).

Royal Buick did not raise this issue at trial. This court has held, however, "that the illegality of a contract may be raised for the first time on appeal by the court on its own initiative. If the court can do this, presumably so can the parties." *Mitchell v. American Savings & Loan Ass'n,* 122 Ariz. 138, 140, 593 P.2d 692, 694 (App. 1979).

Section 43151(a) provides in part:

No person who is a resident of, or who operates an established place of business within, this state shall import, deliver, purchase, rent, lease, acquire, or receive a new motor vehicle, new motor vehicle engine, or motor vehicle with a new motor vehicle engine for use, registration, or resale in this state unless such motor vehicle engine or motor vehicle has been certified pursuant to this chapter. No person shall attempt or assist in any such action.

---

5. The trial court concluded that had Royal Buick not received a GNX, no breach of contract would have occurred. The court presumably viewed General Motors' allocation of a GNX to Royal Buick as a condition precedent to Royal Buick's duty to perform. *See, e.g., DeFreitas v. Cote,* 342 Mass. 474, 475–78, 174 N.E.2d 371, 373–74 (1961); S. Williston, 5 *A Treatise on the Law of Contracts* § 664 (3d ed. 1961).

However, simply because Koenen, with his father and brother, stores vehicles in a warehouse located in California does not establish that Koenen operates an established place of business in California. In addition, the record indicates that Koenen would not have driven the vehicle but merely placed it in storage. The two documents evidencing the prior purchases of vehicles from Royal Buick in connection with Koenen's collection indicate that those two vehicles were registered in Arizona. Even assuming that the California statute could operate so as to negate an Arizona contract for the sale of a car, no evidence was presented that Koenen intended to use, register, or sell the vehicle in California. In addition, there was no evidence that the car did not comply with California standards. We find the contract was valid.

### Proof of Damages

Finally, Royal Buick argues that the trial court should have computed damages as the difference between the cost to cover the loss and the contract price, and that Koenen failed to prove the cost of cover.

The UCC permits a buyer to elect the remedy when damaged by the actions of the seller. A.R.S. § 47–2711. Here, Koenen elected the difference between the fair market value and the contract price. A.R.S. § 47–2713.

Koenen's father purchased a GNX for the family collection from another source. No evidence was introduced as to the purchase price of that particular vehicle. Royal Buick argues that because Koenen's father succeeded in obtaining a GNX from a different source, Koenen suffered no damages or, alternatively, that Koenen was required to introduce evidence as to the purchase price for the other GNX so that the court would be able to determine the fair market value of the GNX which Koenen was unable to purchase from Royal Buick.

■ We disagree. First, the fact that Koenen's father purchased a substitute vehicle is not dispositive. If the father's purchase was proven to be a reasonable substitute for the contracted car then the measure of damages would be the difference between the cost of cover and the contract price. No evidence shows that the vehicle was purchased specifically to substitute for the lost bargain under the Royal Buick contract. The car was purchased in April or May 1988, some 11 or 12 months after Royal Buick repudiated the contract. Also, Koenen testified that even after acquiring the GNX, he was still possibly in the market for another one.

"The burden of proof as to mitigation of damages is on the party asserting the requirement." *Harper & Associates v. Printers, Inc.*, 46 Wash.App. 417, 424, 730 P.2d 733, 736–37 (1986). Royal Buick failed to introduce any evidence that the father's purchase substituted for the Royal Buick contract or that the purchase of that car in any way mitigated the damages under the contract. Therefore, Royal Buick cannot claim that the buyer elected the remedy of cover. *Jamestown Farmers Elevator, Inc. v. General Mills, Inc.*, 552 F.2d 1285, 1293 (8th Cir.1977).

■ Royal Buick also argues that Koenen was required to introduce evidence as to the purchase price for the other GNX so the court could determine the fair market value of the contracted GNX. We disagree. A.R.S. § 47–2713 requires that market price be determined at the time the buyer learned of the breach. Royal Buick breached its contract with Koenen on May 8, 1987. Evidence of the purchase price of a GNX one year later is not dispositive of the fair market value of the vehicle in 1987. Significantly, when the Royal Buick general manager testified regarding the fair market value of the GNX which Royal Buick was selling, he testified that he surveyed Buick dealerships and determined that $45,000 was a fair market value for the GNX. This concession by Royal Buick could certainly be considered by the trial court.

■ The trial court correctly computed damages as the difference between the fair market value and the contract price. Sufficient evidence was presented to support the

trial court's conclusion that $44,900 was the market value of the vehicle.

We affirm.

### ATTORNEYS' FEES

A.R.S. § 12–341.01 authorizes an award to the successful party in any contested action arising out of contract. Section 12–341.01 applies to appeals as well as trials. *Wenk v. Horizon Moving & Storage Co.,* 131 Ariz. 131, 133, 639 P.2d 321, 323 (1982). Appellee Koenen is awarded attorneys' fees incurred in the defense of this appeal.

LACAGNINA and HATHAWAY, JJ., concur.