830 P.2d 862

**Nina DeJONGHE and Anne McDonough, Plaintiffs/Appellees,**

v.

**E.F. HUTTON & CO., INC., Shearson Lehman Hutton Inc., John David Glasgow, Laura Pendleton–Miller, Defendants/Appellants.**

No. 2 CA–CV 91–0057.

Court of Appeals of Arizona, Division 2, Department B.

Sept. 24, 1991.

Review Denied June 16, 1992.

Stuart Herzog, Tucson, for plaintiffs/appellees.

Mesch, Clark & Rothschild, P.C. by J. Emery Barker, Tucson, for defendants/appellants.

1. Shearson Lehman Hutton, Inc. acquired E.F. Hutton.

## OPINION

LIVERMORE, Chief Judge.

Defendants E.F. Hutton & Co., Inc. (E.F. Hutton), Shearson Lehman Hutton, Inc.,[1] John David Glasgow, and Laura Pendleton–Miller appeal from jury verdicts rendered in favor of plaintiffs Nina A. DeJonghe and Anne M. McDonough in this action based upon negligent supervision and civil RICO (Racketeer Influenced and Corrupt Organization). For the reasons set forth below, we affirm.

## FACTS

Viewing the evidence in the light most favorable to sustaining the verdict, *Paul Schoonover, Inc. v. Ram Construction, Inc.,* 129 Ariz. 204, 205, 630 P.2d 27, 28 (1981); *Koenen v. Royal Buick Co.,* 162 Ariz. 376, 379, 783 P.2d 822, 825 (App. 1989), the facts are as follows. Nina DeJonghe was born in 1920 and Anne McDonough in 1899. Both women are widows on fixed incomes. DeJonghe's livelihood consists of social security payments and life insurance proceeds. McDonough receives social security benefits and pension fund payments. Both women have only a high school education and are of limited financial investment sophistication. Both were active as oblates for a monastery in St. David, Arizona. As oblates, they were involved in support activities for the monastery and attended meetings at the Benedictine Convent in Tucson. There they met defendant David Glasgow, a stockbroker. Glasgow's associate was Laura Pendleton–Miller. Glasgow has a master's degree and attended the Wharton School of Finance. Pendleton–Miller holds a bachelor's degree from Georgetown University and a master's degree from Columbia University. Both plaintiffs testified that Glasgow assumed responsibilities as their stockbroker during 1981. At that time, Glasgow worked with fellow broker Pendleton–Miller for Bache, Halsey, Stewart & Shields, Inc. (Bache).

In August 1982, Glasgow and Pendleton–Miller left their previous employ for posi-

tions with E.F. Hutton. At that time, DeJonghe's investments had a value of $40,000, with annual dividends of approximately $4,000. McDonough's account had a value of $80,000, and earned approximately $9,300 a year in dividends. Their portfolios consisted of low-risk, established, dividend-paying securities.[2] Both ladies agreed to retain Glasgow and Pendleton–Miller as their brokers.

After Glasgow and Pendleton–Miller changed employers, they proposed alternative investments to DeJonghe and McDonough. Commencing in September of 1982, Glasgow and Pendleton–Miller radically changed the nature of the two portfolios. Both women signed forms agreeing to growth investments. Growth connotes aggressive, high risk transactions. Although the brokers claimed to have explained these alternatives, both women denied this and said they simply trusted Glasgow and Pendleton–Miller. The brokers, acting under the supervision of Burt Struthers,[3] disposed of plaintiffs' conservative holdings and replaced them with stocks and stock options which were neither safe nor dividend-paying. Four of the five DeJonghe stocks paid an average of 13% interest when Hutton acquired the account. The stocks selected to replace them paid a dividend yield of 2%. McDonough's stocks averaged a 12.8% annual yield. After E.F. Hutton acquired this account, these stocks were replaced with stocks paying nominal or zero dividends. The brokers' strategy included selling calls and puts. Both plaintiffs denied understanding the nature of these types of transactions, but agreed to them based upon the representations of the brokers that these investments would maximize their profits.

After Glasgow and Pendleton–Miller became employed by E.F. Hutton, plaintiffs' accounts became extremely active. The first year E.F. Hutton had DeJonghe's account, purchases exceeded $92,000 even though the average value of the account was only $37,000. Losses totaled $11,606, and DeJonghe paid E.F. Hutton $9,292 in commissions. Margin loans used on DeJonghe's account resulted in $3,446 in interest being charged to DeJonghe. During the first year E.F. Hutton handled McDonough's account, stock purchases exceeded $137,000, even though the average value of the account was only $76,000. The large number of transactions evidenced a pattern of short term speculation which was totally inappropriate for a fixed-income retiree.

When E.F. Hutton completed management of the two accounts, its commissions on DeJonghe's account totaled $10,500 and commissions on McDonough's account exceeded $18,000. Brokers receive no commission on dividends paid to investors, but do receive commissions on transactions. A financial expert called by plaintiffs testified that E.F. Hutton's handling of the accounts clearly showed E.F. Hutton's intent to "churn" the accounts so as to generate commissions.

After E.F. Hutton acquired the DeJonghe account, DeJonghe stopped receiving dividend checks. When she queried Glasgow, he suggested arranging for an E.F. Hutton checking account so that DeJonghe could write checks as needed. DeJonghe believed that the checking account was merely a substitute for dividend payments. Eventually, however, a check was returned as unpaid. Further investigation by DeJonghe disclosed that the checking account was funded by money borrowed by DeJonghe from E.F. Hutton, at 15% interest, with her holdings as security. Because DeJonghe's holdings no longer were of sufficient value to be security for further loans, the check did not clear.

E.F. Hutton's contact with DeJonghe's account ceased in September of 1985 and with McDonough's in January of 1986. DeJonghe sustained a net loss of $66,675 and McDonough's net loss totaled $134,508.

---

**2.** The one exception, according to Professor Edward A. Dyl, was DeJonghe's shares of Inter Tel. According to Dyl, Inter Tel was a speculative stock paying no dividends. DeJonghe owned 500 shares of Inter Tel stock, having a value in 1982 of $10.62 per share.

**3.** At the time, Struthers managed three of Hutton's offices and was the immediate supervisor of Glasgow and Pendleton–Miller.

The losses resulted from the defendants' speculative trading, excessive trading, and excessive risk exposure. Evidence of complaints against Glasgow from other investors was presented. These complaints alleged unauthorized speculative trading.

## PROCEDURAL HISTORY

Plaintiffs filed a civil RICO action against the defendants, based upon alleged violation of A.R.S. §§ 13–2301 *et seq.* and A.R.S. § 44–1991. The complaint was later amended to add a negligent supervision claim against E.F. Hutton.

The matter was tried to a jury and verdicts were returned awarding DeJonghe $99,590 in damages and McDonough $131,937 in damages on the civil RICO claims. The jury awarded both plaintiffs the same sums against E.F. Hutton on the negligent supervision claims. Pursuant to A.R.S. § 13–2314(A), the RICO damages were trebled. The trial court denied defendants' motions for new trial, judgment notwithstanding the verdict, and remittitur, concluding that "the evidence supports the finding of a violation of the securities fraud chapter of the Code...."

## ISSUES ON APPEAL

On appeal, the defendants argue (1) insufficient evidence exists to support the sum of damages awarded by the jury; (2) damages for emotional distress cannot be awarded in a RICO action; (3) damages could not be trebled absent scienter; (4) the negligent supervision award should be vacated; and (5) insufficient foundation was established for the admission of Professor Dyl's testimony.

## SUFFICIENCY OF THE EVIDENCE

■ Plaintiffs' expert, believed by the jury, calculated damages by showing what the value of plaintiffs' accounts would have been had they, with one exception, been left as they were in 1982, including appreci-

ation in the stocks, dividends, and interest on cash, and deducting from those figures the money left after defendants had pursued the disastrous course undertaken. We see nothing inappropriately speculative about this. While one speculative stock[4] was eliminated from Mrs. DeJonghe's portfolio, the jury could reasonably conclude that such deletion would have occurred given the conservative nature of the management of the account. The evidence supports the jury's finding that sums awarded were for actual out-of-pocket losses. *Vairo v. Clayden*, 153 Ariz. 13, 20, 734 P.2d 110, 117 (App.1987).

## EMOTIONAL DISTRESS DAMAGES

■ Defendants next argue that the jury was improperly permitted to award damages for emotional distress suffered by the plaintiffs. Unlike its federal counterpart, 18 U.S.C. § 1964(c), A.R.S. § 13–2314(A) provides that a plaintiff in a civil RICO action is entitled to recover for all injury to person as well as property. We read this provision to provide a broader remedy and to include damages for emotional distress that is proximately caused by defendants' acts. Given the proof of loss of property, damages may also be awarded for attendant emotional distress. *Thomas v. Goudreault*, 163 Ariz. 159, 786 P.2d 1010 (App. 1989); *Farr v. Transamerica Occidental Life Ins. Co.*, 145 Ariz. 1, 699 P.2d 376 (App.1984). DeJonghe presented evidence supporting damages for emotional distress and the award of such damages was permissible.

## WHETHER SCIENTER IS REQUIRED FOR TREBLING OF DAMAGES

■ Defendants next maintain that scienter is required before damages can be trebled in a civil RICO action. Plaintiffs' complaint alleged civil RICO, based upon violation of A.R.S. § 44–1991. A.R.S. § 13–2301(D)(4)(r) defines racketeering as "any act, including any preparatory or com-

---

**4.** Specifically, defendants maintain that although DeJonghe's account contained 500 shares of Inter Tel valued at $10.625 a share in 1982, Dr. Dyl assumed that DeJonghe would have eliminated this stock in September 1982 for cash. In 1984, Inter Tel dropped to $3.5625 a share.

pleted offense, committed for financial gain," involving fraud in the purchase or sale of securities, which is a crime under the laws of the state in which the act occurred. A.R.S. § 13–2314(A) states that a person injured by racketeering may recover treble damages for injuries to person or property. A.R.S. § 44–1991 defines fraud in the purchase or sale of securities:

It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, including securities exempted under § 44–1843 or 44–1843.01 and including transactions exempted under § 44–1844, directly or indirectly to do any of the following:

1. Employ any device, scheme or artifice to defraud.

2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

The supreme court has expressly held that "as to civil cases, scienter is not an element of a violation of A.R.S. § 44–1991(2) ..." *State v. Gunnison*, 127 Ariz. 110, 113, 618 P.2d 604, 608 (1980). *See also Garvin v. Greenbank*, 856 F.2d 1392, 1398 (9th Cir.1988). Accordingly, we conclude that scienter was not a requirement for recovery.

While admitting that actual damages can be recovered without a showing of scienter, defendants claim treble damages cannot because they are "punitive in nature." *Wyatt v. Wehmueller*, 167 Ariz. 281, 286, 806 P.2d 870, 875 (1991). Under *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986), such damages are appropriate only where there is an intent to injure or a conscious course of conduct with knowledge that it creates a significant risk of harm to others. We have been cited no cases imposing the rule on the court-cre-

ated remedy of punitive damages to a legislatively created remedy of treble damages, which by its terms has no such requirement. A.R.S. § 13–2314(N) characterizes the civil remedy as "remedial and not punitive." We view this as akin to the antitrust remedy of treble damages, which is intended not only to compensate for losses and to deter from misconduct but also to encourage private litigants to supplement official enforcement of important criminal laws by providing an inducement for such action. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). This important public policy should not be undercut by engrafting on a legislative enactment court rules created for another purpose.

■ Even, however, if some level of scienter is required before damages may be trebled under A.R.S. § 13–2314(A), we believe that issue has not been preserved for appeal. The thrust of the argument below, now apparently abandoned, is that scienter is required even to recover actual damages. Moreover, the case was tried on the theory that the defendants engaged in their course of conduct without making clear to plaintiffs the risky nature of the new investments. From this evidence, a jury, if asked, could infer that defendants knew or were extraordinarily reckless in not knowing that their elderly clients did not realize the nature of the risks they were taking. That level of scienter would permit trebling. But that inquiry was not presented to the jury either by way of instruction or special interrogatory to be acted upon by the court for purposes of trebling actual damages. Defendants cannot seek a retrial on an issue that could have been but was not raised and resolved at trial.

## NEGLIGENT SUPERVISION

■ Defendant E.F. Hutton argues that it should not be held liable on a theory of negligent supervision for the actions of its brokers. It maintains that a fatal absence of proof regarding the breach of its standard of care exists. Plaintiffs counter, and we agree, that the record amply shows that E.F. Hutton participated in its brokers'

acts because an E.F. Hutton supervisor approved (1) plaintiffs' accounts buying on margin and selling puts, (2) the acquisition of high-risk, non-dividend paying stock, (3) the disposal of conservative, high-yield investments, and (4) other transactions and arrangements resulting in depletion of plaintiffs' accounts. This evidence also supports a finding of racketeering. Expert testimony is not necessary when the "negligence is so grossly apparent that a lay person would have no difficulty recognizing it." *Asphalt Engineers, Inc. v. Galusha*, 160 Ariz. 134, 135–36, 770 P.2d 1180, 1181–82 (App.1989). Plaintiffs presented sufficient evidence to establish E.F. Hutton's negligent supervision of its brokers.

### ADMISSION OF TESTIMONY FROM DR. DYL

 Finally, defendants argue that error occurred when the trial court permitted Dr. Dyl to testify about the custom and usage in the brokerage industry. The admission of evidence is committed to the sound discretion of the trial court. *State v. Robinson*, 165 Ariz. 51, 56, 796 P.2d 853, 858 (1990).

Defendants maintain that, because Professor Dyl was a university professor and department head of the University of Arizona's Department of Finance and Real Estate, his testimony was given undeserved deference by the jury. Defendants note that Dr. Dyl has never obtained a securities license and has no experience in the industry. Defendants liken the foundational requirements for an expert in securities to that of an expert witness in a medical malpractice action. *Rodriguez v. Jackson*, 118 Ariz. 13, 17, 574 P.2d 481, 485 (App.1977) (expert witness against physician must be a physician). *See also Woodward v. Chirco Construction Co., Inc.*, 141 Ariz. 520, 522, 687 P.2d 1275, 1277 (App. 1984), *modified on other grounds*, 141 Ariz. 514, 687 P.2d 1269 (1984) (only a contractor is competent to testify as an expert witness on the standard of care among contractors).

We do not believe that an expert need be a licensed broker to opine on practices in the brokerage industry if he has knowledge helpful to the trier. See *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326 (App.1978). Rule 702, Ariz.R.Evid., 17A A.R.S., authorizes the introduction of expert testimony if it will assist the trier of fact to understand the evidence. Dr. Dyl was a professor in the Department of Finance and Real Estate at the University of Arizona. He received his master's and doctoral degrees from Stanford University. He was the head of the Department of Finance and Real Estate at the University of Arizona and was well published regarding investments and stocks. The trial court did not abuse its discretion in permitting him to testify as an expert witness.

### CONCLUSION

We affirm. Appellees will be awarded attorney's fees on appeal upon compliance with Rule 21(c), Ariz.R.Civ.App.P., 17B A.R.S.

FERNANDEZ and HATHAWAY, JJ., concur.