459 P.2d 533

EARLE M. JORGENSEN COMPANY, a corporation, Appellant,

v.

TESMER MANUFACTURING COMPANY, Inc., an Arizona corporation, Theodore F. Tesmer and Roberta Tesmer, his wife, dba Tesmer Manufacturing Company, Appellees.

No. 1 CA–CIV 693.

Court of Appeals of Arizona, Division 1.

Department B.

Oct. 14, 1969.

Tupper, Skeens & Rapp, by Edward Crehan Rapp, Phoenix, for appellant.

Kuhse, Petrie & Reynolds by Joe S. Reynolds and E. Gene Wade, Mesa, for appellees.

HAIRE, Judge.

Plaintiff Earle M. Jorgensen Company, a corporation, brought suit on an open account against the defendant corporation, Tesmer Manufacturing Company, and against the individual defendants Theodore F. Tesmer and Roberta Tesmer. Defendant Tesmer Manufacturing Company counterclaimed for damages caused by Jorgensen's alleged "breach of express and/or implied warranties". The trial court awarded plaintiff judgment on the open account and awarded defendant judgment on the counterclaim. Plaintiff appealed from the judgment for defendant on the counterclaim. The judgment for plaintiff on the open account is not involved in this appeal. Plaintiff-counterdefendant Earle M. Jorgensen Company will hereinafter be referred to as plaintiff, and the defendant-counterclaimant Tesmer Manufacturing Company will be referred to as defendant.[1]

The facts of this case, taken in a light most favorable to sustaining the judgment on the counterclaim, are as follows: In late 1963 defendant began to purchase from

1. Because judgment on the counterclaim was in favor of Tesmer Manufacturing Company, Inc., only, and not Mr. and Mrs. Tesmer, only Tesmer Manufacturing Company, Inc., is referred to by the term "defendant".

plaintiff steel rods to be used in the manufacture of farm equipment by defendant. The defendant, newly in business, was marketing a piece of machinery called the Tesmer Master Tiller II (hereinafter, "tiller"). The steel rods supplied by plaintiff were used as axles for the tiller. These axles were attached to the shaft of the tiller by welding, and at first were made of steel designated as #1018. The #1018 steel rods were not finished steel and required hand-grinding and sanding before they could be effectively used as axles. Because of this defendant asked plaintiff's salesman, one Snyder, if plaintiff could supply steel rods which would be smooth enough for use as axles without hand-grinding and sanding, but which would still be compatible with the welding process then being used by defendant for the #1018 steel. In response, plaintiff stated that it could supply such a product, and then delivered to defendant a product designated as precision-shafted #1045 steel.

Defendant then started using the #1045 steel in the manufacture of its tillers. When used by purchasing farmers, some of the tillers broke at or near the spots where the axles were welded to the shafts. It was subsequently discovered that the breakages were due to the welding process used by defendant, and that the #1045 steel could not be properly welded with the process which defendant had used for welding #1018 steel. Defendant, at its own expense, immediately repaired and replaced the axles on all the previously sold tillers which had been made with the #1045 steel.

Thereafter, upon defendant's failure to pay for the steel, plaintiff brought suit for the balance due on the open account. Defendant answered and filed the above-mentioned counterclaim.

Defendant's counterclaim alleged that plaintiff had breached warranties "express and/or implied" that the #1045 steel was compatible with defendant's existing welding process. The counterclaim sought damages (1) for the amount actually expended by defendant in repairing the defective tillers; (2) for loss of good will; and (3) for loss of profits for the years 1964 through 1966, inclusive.

After a lengthy trial, judgment was entered upon jury verdicts which granted the following relief: On the open account, plaintiff was awarded judgment in the amount of $6,070.72 against defendant Tesmer Manufacturing Company, Inc., and also against the individual defendants, Mr. and Mrs. Tesmer. On the counterclaim, defendant Tesmer Manufacturing Company, Inc., was awarded judgment against the plaintiff for $3,527.55 "for actual expenses of repair of tillers" and for $15,-000.00 "for loss of profits for the year 1964." [2] Plaintiff has appealed from this judgment on the counterclaim.

▨ Plaintiff's initial contention is that no express warranty arose even if its salesman, Snyder, did represent to defendant that #1045 steel was compatible with the process being used by defendant to weld #1018 steel to the tiller shaft. It is plaintiff's position that such a statement, if made, refers to "extrinsic matter" [3] and is not a representation "relating to the goods" within the meaning of A.R.S. Sec. 44-212 (Uniform Sales Act Sec. 12),[4] which reads as follows:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any state-

2. The trial court refused to submit to the jury the issue of damages for any loss of good will or for loss of profits for the years 1965 and 1966, but no question has been raised concerning that refusal on this appeal.

3. That is, something other than an inherent defect or lack of quality.

4. All transactions material herein arose prior to the repeal of the Uniform Sales Act.

ment purporting to be a statement of the seller's opinion only shall be construed as a warranty."

Contrary to plaintiff's contention, there are many cases which hold that a statement referring to "extrinsic matter" (to use plaintiff's phrase) may constitute an affirmation of fact or promise "relating to the goods" within the meaning of the above statute. In Royce Chemical Co. v. Sharples Corp., 285 F.2d 183 (2d Cir. 1960), dealing with an express warranty that a chemical centrifuge was suited to the buyer's manufacturing process, the court held that (1) a seller's affirmation of the suitability of a machine for the buyer's use is a statement "relating to the goods" constituting an express warranty and (2) that under the facts of that case, damage caused not by an intrinsic defect in the product, but merely by virtue of its incompatibility with the buyer's manufacturing process, was the result of a breach of such warranty. See also Rappaport v. Boyer & Gilfillan Motor Co., 239 Minn. 477, 59 N.W.2d 302 (1953); and Statewide Food Corp. v. Simpson, 35 Misc.2d 887, 231 N.Y.S.2d 463 (Sup.Ct. 1962). All of the many cases cited by plaintiff are distinguishable on the basis that they did not involve fact situations wherein the buyer had made known to the seller the specific manner of use planned, and had relied upon the seller to supply a product suitable for use in such manner.

It is our opinion that a statement to the effect that a particular type of steel can be welded by a certain process then being used by the buyer is an affirmation or promise "relating to the goods" and may give rise to an express warranty under A.R.S. Sec. 44–212.

Plaintiff next contends that any comments made by its salesman Snyder as to the weldability of the steel were in the nature of mere opinion and not affirmations of fact. As indicated previously, Sec. 44–212 provides that no statement purporting to be a statement of the seller's

opinion only can be construed as a warranty. A similar contention was raised in Royce, *supra*, wherein appellant-salesman "vouched" for the suitability of its machine. The response of the court therein is pertinent here; it said:

"We have no doubt that the natural tendency of this statement, which is quoted above, is to induce a sale. And we agree with the district court that this statement was an affirmation of fact—that the machine was suitable for the Buyer's use—and not a mere statement of opinion." (285 F.2d at 186).

In the case at hand, the evidence shows that Snyder's statement was no casual expression intended to be understood merely as his opinion. Upon defendant's request, Snyder undertook to determine whether or not the #1045 steel would be compatible with defendant's welding process, and after a lapse of two or three days, he called defendant and said that he had consulted his employer, and that the steel would be compatible with defendant's welding process. Under these circumstances it is clear that Snyder's statement was an affirmation of fact, not an opinion. It related to the goods, and had a natural tendency to induce a purchase; it was clearly intended that defendant should rely thereon and the defendant did rely thereon. The statement constituted an express warranty which was breached when plaintiff supplied a steel incompatible with the welding process then being used by defendant.

▮ Plaintiff next argues that the trial court should not have given an instruction allowing the jury to find liability on the theory of breach of *implied* warranty. This contention appears to rest upon the same theory advanced by plaintiff in opposition to the finding of an express warranty. Thus plaintiff contends that in order to have a breach of implied warranty there must be some inherent defect in the quality of the goods which would render them unsuitable for the use contemplated by the buyer.

A.R.S. Sec. 44–215 provides in part that there is an implied warranty:

\* \* \* \* \* \*

"1. Where the buyer, expressly or by implication, makes known to the seller the *particular purpose* for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." (Emphasis supplied.)

Admittedly in this case the #1045 steel had no inherent defects and could have been incorporated in the tiller in a manner which would have provided the tiller with a dependable axle. However, the "particular purpose" for which the goods were required was not to serve as an axle in the abstract, but rather the "particular purpose" was to incorporate the goods through the welding process then being used by defendant as an axle in defendant's tiller, and this is the particular purpose which was made known to plaintiff.

■ Under the evidence, the jury could have found that defendant told plaintiff the particular purpose for which the goods were required and that defendant relied upon the seller's (plaintiff's) skill and judgment to supply steel which could be incorporated in the tiller as an axle by the welding process then being used by defendant and known by plaintiff's representative. Under such circumstances, even if Snyder had not expressly stated that the # 1045 steel would be compatible with the welding processes of the defendant, there would have been an implied warranty that the steel supplied was fit for the purpose of being incorporated in the tiller as an axle by defendant's welding process. If, however, Snyder went further, as the defendant testified, and stated affirmatively that the steel being supplied was

compatible with the welding process of defendant, then there would have been an express warranty. But the creation of the express warranty by Snyder's affirmative statement would not have negated the existence of an implied warranty. See A.R.S. Sec. 44–215(6). There is ample evidence from which the jury could have found either an express or implied warranty, or both.

■ A further contention is made by plaintiff to the effect that there can be no implied warranty of fitness for a particular purpose because of the trade name exception in the Uniform Sales Act.[5]

However, in this case defendant did not order any product by its trade name. Defendant advised plaintiff of its requirements, and plaintiff supplied #1045 precision-shafted steel to meet those requirements. Even if this particular classification of steel could be considered as a *trade name* (which we doubt), it was not specified or ordered as such by defendant.

■ Plaintiff's final contention is that even if we assume a breach of warranty, only the $3,500.00 in actual damages for the repair of the equipment should have been allowed, and that the trial court committed reversible error in allowing the jury to consider the issue of lost profits. It is plaintiff's position that: (1) defendant did not have an established business and therefore could not recover for lost profits; (2) there was no evidence that the loss of profits was a proximate result of the breach of warranty, if any, as opposed to other conditions, such as competition and the seasonal factors which influence the tiller business; and (3) there was no credible and certain evidence showing the amount of the lost profits, if any.

Considering plaintiff's first contention, the evidnce showed that defendant was engaged in a new business and had just com-

---

5. A.R.S. Sec. 44–215(4) provides as follows:

"4. In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

menced selling the tiller at the time of the breach of warranty. While it has been stated that one engaged in a new business cannot recover damages for lost profits, 22 Am.Jur.2d Damages Sec. 173 (1965); 25 C.J.S. Damages § 42 b (1966), we are of the opinion that where evidence is available to furnish a reasonably certain factual basis for computation of probable losses, recovery of lost profits cannot be denied even though a new business venture is involved. Golden Gate Hop Ranch, Inc. v. Velsicol Chemical Corp., 66 Wash.2d 469, 403 P.2d 351 (1965), cert. denied 382 U.S. 1025, 86 S.Ct. 644, 15 L.Ed.2d 539 (1966); Barbier v. Barry, 345 S.W.2d 557 (Tex. Civ.App.1961).

■ Turning now to the question of the sufficiency of the evidence to sustain an award for lost profits, the principle is well established that once the *fact* of damages has been established, the *amount* of the damage may be established with proof of a lesser degree of certainty than is required to establish the fact of damage. Harris Cattle Co. v. Paradise Motors, Inc., 104 Ariz. 66, 448 P.2d 866 (1968); Gilmore v. Cohen, 95 Ariz. 34, 386 P.2d 81, 11 A.L.R.3d 714 (1963); Isenberg v. Lemon, 84 Ariz. 340, 327 P.2d 1016 (1958), modified, 84 Ariz. 364, 329 P.2d 882 (1958); Jacob v. Miner, 67 Ariz. 109, 191 P.2d 734 (1948); 22 Am.Jur.2d Damages Sec. 172 (1965). We must therefore first determine whether or not there is any evidence which shows that damages *in the nature of lost profits* were in fact sustained by defendant because of plaintiff's breach of the warranty.

■ In reviewing the testimony it must be noted that the breakage occurred during the first part of April 1964, which, according to defendant's own witnesses was at the end of the basic selling season for the year. Immediately after the breakage occurred, defendant replaced the axles made of #1045 steel. Defendant did not produce any dealer or farmer who testified that any sales had been lost because of the welding problem. Rather, from the evidence introduced by defendant, the definite impression arises that the welding problem had no appreciable effect on its sales.

For example, defendant's first witness, Paul W. Carsey, was a farm equipment dealer from Fowler, California, who had agreed to be a dealer for defendant and sell the tiller in his area. He bought four machines, two in January 1964, and two in March 1964. He immediately sold three of the tillers but still had the remaining one at the time of trial in March 1967. The axle on one of the machines which was sold in March 1964 broke and was immediately repaired by defendant. In answering questions from defendant's own counsel, Carsey testified as follows:

"Q Did you continue to sell the units at all after this breakage occurred?

"A No, I didn't sell another unit after that.

"Q Why not?

"A Well, I had one unit left. And I used it to loan to the customers until we went through these others. And by the time we got back to that, the season was over.

"Q What is your season in California for the use of this particular machine?

"A About the month of April.

and

"Q Did you make any additional efforts on your own after April 1964 in subsequent years to sell any of the machines?

"A Yes.

"Q Were you able to sell any machines?

"A No.

"Q Do you know why you were unable to sell the machines?

"A Well, probably one reason is I had one machine left that I was trying to sell that one first. In the meantime there had been several other machines that had come on the market that were being sold."

Another defense witness, Sam Thomas, testified that during the year 1964 he was

the manager of the Gila River Indian Community Tribal Farm consisting of more than 12,000 acres. He testified that in January 1964, he purchased a tiller from defendant and that he also had two other types of tillers, designed to do the same job. He further testified concerning some chain breakage on his tiller which was unrelated to the welding problem, and then stated that if something were to happen to the tiller which he now has, he would not hesitate to buy another.

Defendant's witness, Jacob Shaffer, testified that he worked for Bingham Equipment Company, a dealer in farm equipment which in early 1964 had outlets in Mesa and Casa Grande, Arizona. He stated that the primary selling season was "from January 'till the middle of March and in September for maybe thirty days in September." The breakage due to the welding problem occurred after April 1, 1964, when the major part of the 1964 selling season was over. Defendant's Exhibit 20 in evidence shows that by the end of the first week in April 1964 it had sold nine tillers to Bingham, and that in September 1964 defendant had sold him five more tillers. From Mr. Shaffer's testimony, it appears that all fourteen of these tillers were sold by Bingham to individual farmers during the year 1964. In answer to a question by defendant's counsel as to whether the breakages had affected the selling of the machines, Shaffer answered:

"A Well, there is always such a thing as a person will stop to find out what is causing the trouble.

"Q Did the breakage in any way affect your opinion of the machine?

"A Well, it could, could be it affected it.

"Q From your exposure to the sales of the machines, do you have any opinions as to whether it affected other people's purchasing of the machine?

"MR. RAPP: Your Honor—

"THE WITNESS: It always does.

"MR. RAPP:—I will object to that because it is calling for mere speculation on his part.

"THE COURT: You may answer yes or no.

"THE WITNESS: Yes, I would say.

"BY MR. REYNOLDS:

"Q Do you have any basis for knowing why this affects other persons buying the machine?

"A Well, people talk to each other and about these problems."

This testimony is very indefinite and inconclusive. That Bingham did not quit buying the product because of the breakage problem is shown by the fact that five additional machines were purchased in September. Nor is there any testimony as to any specific loss of sales. Defendant's Exhibit 20 shows that while only nine tillers were sold to Bingham during the longer primary season, five were sold during the short secondary season in September 1964. Thus, there is no evidence which shows with any reliability or certainty that defendant in *fact* lost any profits in 1964 due to the breach of warranty by plaintiff.

Even if we were to assume that the *fact* of damage had been proven insofar as concerns lost profits, defendant is still confronted with the problem that the evidence fails to establish any reasonably certain factual basis for the computation of the *amount* of the claimed lost profits. Here we are involved with not only a new business, but also with the marketing of a new product. There was no history of prior sales by the defendant nor is there any history of prior sales of this identical product by a predecessor or even by a competitor. On its counterclaim defendant had the burden of proving the amount of its damages with reasonable certainty. Gilmore v. Cohen, *supra*; Isenberg v. Lemon, *supra*; and Jacob v. Miner, *supra*. All we have in this regard is an estimate made by defendant's president (who had no prior experience in selling agricultural equip-

ment) based upon a few conferences with dealers who were not even willing to give defendant a single advance order.

As held in Gilmore, *supra,* conjecture or speculation cannot provide the basis for an award of damages, and the evidence must make an approximately accurate estimate possible. Here the evidence falls far short of meeting this test. Also, see Isenberg, *supra.*

There is one final matter to be disposed of in this appeal. This court, after a hearing, granted an injunction on December 6, 1967, enjoining plaintiff-appellant from satisfying its $6,070.72 judgment and from proceeding with a sheriff's sale under a writ of attachment, pending the decision of this case on the merits of the appeal. In view of the decision of this court, the said injunction is hereby dissolved.

The judgment of the trial court in favor of the defendant-counterclaimant Tesmer Manufacturing Company, Inc., must be modified so as to delete therefrom that portion relating to loss of profits for the year 1964 in the amount of $15,000.00. Upon remand the trial court is directed to modify the prior judgment in accordance with the foregoing. As so modified, the judgment of the trial court is affirmed.

EUBANK, P. J., and JACOBSON, J., concur.