841 P.2d 215

**James P. RHUE, a single man,
Plaintiff–Appellee,**

v.

**John W. DAWSON, a single man,
Defendant–Appellant.**

**No. 1 CA–CV 89–543.**

Court of Appeals of Arizona,
Division 1, Department B.

Sept. 22, 1992.

As Corrected Oct. 2 and Nov. 23, 1992.

Byrnes, Rosier & Himelrick by Richard G. Himelrick, Scottsdale, Paul G. Ulrich, P.C. by Paul G. Ulrich, Phoenix, for plaintiff-appellee.

Meyer, Hendricks, Victor, Osborn & Maledon, P.A. by Andrew D. Hurwitz, Ron Kilgard, Phoenix, for defendant-appellant.

## AMENDED OPINION

LANKFORD, Judge.

Defendant John W. Dawson appeals from a judgment on a jury verdict in favor of plaintiff James P. Rhue and from the trial court's order denying the motion for judgment notwithstanding the verdict or, in the alternative, to modify judgment or for a new trial.

The jury awarded compensatory damages and punitive damages to Rhue on claims arising out of a joint venture agreement. In addition, the jury found that Dawson had violated Ariz.Rev.Stat. (A.R.S.) § 13–2310 [1] which prohibits fraudulent schemes and artifices.[2] As a result, the trial judge trebled the compensatory damages under Arizona's civil racketeering statute [3] and awarded a total judgment,

---

1. The various statutes herein refer to the version currently in effect. That version is identical to the one in effect in 1987, unless otherwise stated.

2. A.R.S. § 13–2310(A) defines the crime of fraudulent schemes and artifices, as follows:

 Any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions is guilty of a class 2 felony.

3. The civil racketeering statute authorizes treble civil damages pursuant to A.R.S. § 13–2314(A) which states, as follows:

 A person who sustains injury to his person, business or property by racketeering as defined by § 13–2301, subsection D, paragraph 4 ... may file an action in superior court for the recovery of treble damages and the costs of the suit, including reasonable attorney's fees....

 A.R.S. § 13–2301(D)(4) (1988) defines "racketeering" as:

 any act, including any preparatory or completed offense, committed for financial gain,

including attorneys' fees and costs, of $8,379,339 plus interest on that amount until paid.

Dawson raises five main issues on appeal:

1. Did the trial court err in admitting evidence of Dawson's alcoholism?
2. Was the evidence sufficient to sustain an award of damages for lost profits?
3. Was the evidence sufficient to sustain a verdict for:
 a. wrongful dissolution of the partnership;
 b. breach of fiduciary duty; and
 c. racketeering?
4. Did the trial court err in instructing the jury regarding punitive damages?
5. Did the trial court err by including both trebled compensatory damages under the racketeering statute and punitive damages in the judgment?

## I.

The facts of this case must be viewed in the light most favorable to sustaining the jury verdict and resulting judgment. *Rogus v. Lords*, 166 Ariz. 600, 601, 804 P.2d 133, 134 (App.1991).

During a meeting in early December, 1986, Rhue proposed to Dawson that they form a partnership.[4] The purpose of the partnership was to acquire and develop shopping center property. Rhue was to be the partner with shopping center development expertise and was to handle the day-to-day details. Dawson was to be the financial partner, contributing the bulk of the capital and facilitating financing. Rhue and Dawson agreed to purchase, renovate, and sell a shopping center and to share the profits and equity equally. Dawson was to receive a preferred distribution of partnership funds to reimburse him for capital contributions at the time the partnership assets were liquidated. Rhue was to receive a development fee equal to three percent of the cost of the redevelopment project. Rhue and Dawson named the entity "Shopping Center Enterprises of Arizona" (hereinafter referred to as "SCEA").

Rhue testified that after they had discussed the terms of the partnership in their first meeting in December, 1986, Dawson stood up, put his arm around Rhue, and said, "Well, come on, partner, I'm going to show you your new office." Rhue began working on the joint project either that same day or the next day. The parties did not immediately formalize their business association by entering into a written agreement, although drafts were circulated for the parties' review.

Rhue located two shopping center properties which were eventually purchased by SCEA. SCEA first purchased the Valley Plaza Center for $3.2 million. For $4 million, SCEA then purchased an adjacent site on which a vacant store was located. The two sites were separated by 75th Street in Scottsdale, Arizona. Rhue and Dawson originally planned to develop both sites into a unified shopping center to be called "Los Arcos Crossing."

To facilitate bank financing, Dawson contacted an appraiser recommended by the lending institution to obtain appraisals on the properties. The appraiser provided a simple letter appraisal of the "as is" market value of the Valley Plaza Center alone at $3,625,000. The appraiser later furnished Dawson with a full appraisal valuing the combined properties at $15,625,000. This appraisal assumed that the properties would be redeveloped pursuant to plans and specifications prepared by SCEA. Evi-

---

which is chargeable or indictable under the laws of the state in which the act occurred ... and punishable by imprisonment for more than one year, regardless of whether such act is charged or indicted, involving:

....

(t) A scheme or artifice to defraud.

4. Although Rhue and Dawson eventually entered into an agreement forming a joint venture, discussions between the parties and trial testimony referred to "partners" and "partnership." Therefore, we will utilize partnership terms when referring to the parties and the business association formed between Rhue and Dawson. Whether the business association is considered a partnership or joint venture makes little difference, if any, in our analysis. *See* discussion *infra* of the relationship between joint venture and partnership in part III, n. 8.

dence presented at trial indicated that Rhue and Dawson estimated the cost for acquiring and renovating the property at $11,849,580,[5] for a projected profit of $3,775,420. Rhue's one-half share of the projected profits would have been $1,887,710.

Just seven days after Dawson received the full appraisal, he presented a form entitled "Joint Venture Agreement" for Rhue's signature. According to Rhue, Dawson pressured Rhue to sign the agreement within a time period too brief to permit Rhue to read it. When Rhue specifically asked Dawson whether certain changes they had previously discussed and agreed upon were reflected in the agreement, Dawson replied in the affirmative.

Dawson, however, failed to bring to Rhue's attention the insertion of a unilateral "Option to Purchase" clause. Previous drafts that had been circulated between Rhue and Dawson lacked this buyout provision. The clause allowed Dawson to buy Rhue's interest in the partnership merely by returning any capital contribution Rhue had made. Because Rhue contributed primarily expertise but not capital and would be entitled to an equal share of the project's equity upon dissolution, this provision was highly unfavorable to Rhue. Rhue signed the agreement without reading and verifying the contract provisions for himself.

Rhue learned approximately two months later that the agreement he had signed contained a buyout clause. Rhue immediately delivered a letter to Dawson stating that Rhue had never agreed to the buyout provision, that he did not intend to be bound by the written agreement, and that he expected Dawson to renegotiate the buyout provision according to their earlier agreements. Dawson responded with a letter from his attorney and a notice of intent to exercise the buyout provision. Dawson,

through his staff, then proceeded to lock Rhue out of the partnership offices, claiming that Rhue had removed records and files.

Soon thereafter, Rhue filed suit against Dawson. The second amended complaint contained counts for declaratory judgment, fraud in the inducement/constructive fraud, breach of fiduciary duty, violation of the civil racketeering statute, breach of the implied covenant of good faith and fair dealing, attempted wrongful dissolution of partnership, unjust enrichment, rescission, estoppel, and constructive trust. The jury returned the verdict in Rhue's favor, the superior court denied Dawson's post-trial motions, and Dawson appealed.

## II.

Dawson first alleges that evidence of his alcoholism was irrelevant to the issues at trial, and therefore, that the trial court erroneously admitted this evidence.[6] Alternatively, Dawson argues that even if relevant, the evidence was unfairly prejudicial and should have been excluded under Arizona Rules of Evidence Rule 403.

When we first reviewed this issue, we concluded that no objection to the evidence had been preserved for appeal. Dawson's motion for reconsideration directed us to that part of the trial transcript which shows that he made an objection. We conclude that although Dawson preserved at least one objection, his objection was insufficient to preserve the error for appeal.

The admissibility of the evidence of alcoholism was first raised when Rhue filed a motion *in limine* to clarify the extent to which such evidence would be admissible at trial. Rhue's motion cited four reasons for admitting the evidence: (1) to explain why the project failed after Rhue was ousted from the partnership; (2) to explain Dawson's mood swings and "confrontational

---

5. The $11,849,580 figure was suggested in Rhue's trial memorandum and cited in Dawson's opening brief. Evidence at trial suggests the projected figure may have been $11,964,580; the difference is immaterial.

6. Dawson filed, and we considered and granted, a motion for reconsideration relating only to this portion of this opinion. In reconsidering our prior opinion, we have amended this portion of the opinion. Although the result is the same, the reasoning differs from the original opinion.

and belligerent" behavior; (3) to explain why Dawson was careless in confiding to his then-girlfriend that he planned to get rid of Rhue; and (4) to attack Dawson's credibility by establishing a reason for Dawson's inability to recall conversations.

Dawson filed no written response to the motion *in limine*. The motion was argued in chambers without a court reporter. As a result, Dawson's arguments for excluding the evidence were not recorded.

The arguments on the motion were later summarized on the record as follows:

MR. SUSEMIHL [Dawson's counsel]:
. . . .

While on the record, we ought to briefly summarize what happened yesterday in chambers. Mr. Himelrick [Rhue's counsel] explained to the court his desire to put in and make alcoholism an issue in order to attack the credibility of Mr. Dawson and his ability to remember what he said, and also to show it affected Mr. Dawson's abilities to successfully construct the shopping center. *We objected to all of that as being irrelevant and solely for purposes of prejudicing the jury.* And the court indicated, if I state it correctly, it did have probative value, and it was relevant, over our objection, and you are going to allow that evidence in. We agreed we would put that on the record to preserve that objection.

THE COURT: That is accurately stated, I believe.

(Emphasis added).

In the original version of this opinion, we held that Dawson had waived his relevancy objection and, in *dictum*, stated that evidence of Dawson's alcoholism was not relevant to the issues tried in this case.

■ On reconsideration, we reexamined the record. We conclude that evidence of Dawson's alcoholism and excessive alcohol consumption could affect his credibility and memory loss. Therefore, the trial court did not abuse its discretion in admitting the evidence as relevant. *See State v. Stotts,* 144 Ariz. 72, 82, 695 P.2d 1110, 1120 (1985) (a trial court's decision admitting evidence will not be disturbed absent abuse of discretion).

" 'Relevant evidence' means any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ariz.R.Evid. 401.

The threshold question that the trial court must decide when considering the admissibility of any evidence is whether the evidence, in any manner, aids the trier of fact in resolving the case. An item of evidence is relevant if it bears some relationship to a matter properly provable in the case. . . . to the determination of the action. The standard used in making this determination is one of probability. If the evidence has "any tendency" to make the existence of "any fact . . . of consequence" "more probable or less probable" than without the evidence, the evidence is "relevant." As such, this is a very liberal definition, defining as wide a range as possible of evidence as "relevant."

CRANE MCCLENNEN, ARIZONA COURTROOM EVIDENCE MANUAL, § 401 at 401–1.

As Dawson concedes, the trial court's admission of the evidence is discretionary and reviewable only for abuse of discretion. Dawson's objection on the record was limited to the prejudicial effect and relevancy of the evidence to show "the credibility of Mr. Dawson and his ability to remember what he said, and to show [alcoholism] affected Mr. Dawson's abilities to successfully construct the shopping center."

■ With regard to memory loss and credibility, the trial court acted within its discretion in admitting the evidence as probative. Dawson repeatedly testified that he did not remember certain events, his own prior statements, and his own prior testimony. Dawson's version of some events and conversations, including his statement that he "will get rid of Jim Rhue" and his statements when he presented the agreement to Rhue for signature, differed significantly from the testimony of other witnesses. His credibility could be undermined with evidence of his alcohol-

ism. The trial court did not abuse its discretion in admitting the evidence on this ground. *See* Ariz.R.Evid. 401. Where, as here, evidence is admissible for one purpose, but not for another, the evidence is admissible. *Gaston v. Hunter,* 121 Ariz. 33, 41, 588 P.2d 326, 334 (App.1978). The evidence of Dawson's alcoholism was admissible to substantiate his lack of memory and credibility.

The record indicates, however, that the evidence of Dawson's alcoholism admitted at trial exceeded the scope of the matters for which the evidence was relevant. Much of the evidence at trial did not relate to memory loss or to any other stated purpose of the evidence. For example, the evidence included an alcohol-related automobile accident in which Dawson was involved twenty years prior to the trial. This evidence is so attenuated as to be clearly inadmissible, yet no objection appears on the record. *See* Ariz.R.Evid. 103.

■ At the point the evidence exceeded the purpose for which it was admissible, Dawson was required to object. Well-settled law dictates that the objection must be specific as to those portions of the evidence that are claimed to be inadmissible. If not, Dawson cannot allege error. *Killingsworth v. Nottingham,* 18 Ariz.App. 356, 358, 501 P.2d 1197, 1199 (1972). Counsel bears the burden of pointing to irrelevant portions of proffered evidence; the trial judge need not separate the "sheep from the goats" and segregate the admissible from the inadmissible parts. *Grant v. Arizona Public Service Co.,* 133 Ariz. 434, 450, 652 P.2d 507, 523 (1982). Dawson was obligated to specifically object when Rhue presented evidence which did not relate to his lack of memory. Dawson did not do so.

Any objection to relevancy is therefore waived.

Although it is not clear that Dawson preserved the issue, we also review a trial court's determination under Ariz.R.Evid. 403 that evidence was not unduly prejudicial on an abuse of discretion standard. *See State v. Neal,* 143 Ariz. 93, 101, 692 P.2d 272, 280 (1984). The prejudice of alcoholism evidence is apparent. However, Rule 403 requires not just that the evidence be prejudicial, but that the probative value of the evidence is *substantially outweighed* by *unfair* prejudice. Ariz.R.Evid. 403. Here, the evidence was relevant to explain Dawson's memory loss and with regard to his credibility. The trial court did not abuse its discretion by allowing the evidence for this purpose as not substantially outweighed by unfair prejudice to Dawson.

The evidence of Dawson's alcoholism was relevant to the issues of credibility and memory. To the extent some of evidence at trial exceeded these admissible purposes or was marginally relevant but unfairly prejudicial, Dawson made no specific objection on the record and thus failed to preserve the issue for appeal. We therefore affirm the trial court's ruling admitting this evidence.

### III.

In his second issue on appeal, Dawson contends that the evidence is insufficient to show that he wrongfully dissolved the partnership.[7] He argues that the evidence proves only that the partnership was one at will and that such a partnership may be dissolved[8] at any time by the express will of either partner.

---

7. For present purposes, whether the business association is a joint venture or partnership makes little difference. A joint venture differs from a partnership because usually, although not necessarily, a joint venture is limited to a single transaction. *Rubi v. Transamerica Title Ins. Co.,* 131 Ariz. 403, 406, 641 P.2d 891, 894 (App.1981). Principles governing fiduciary duties, e.g., exercising the utmost good faith and recognizing the obligation of loyalty, fairness and honesty, apply to partnerships and joint ventures alike. *See DeSantis v. Dixon,* 72 Ariz. 345, 350, 236 P.2d 38, 41 (1951) (partnership);

*Ghiz v. Millett,* 71 Ariz. 4, 8–9, 222 P.2d 982, 985 (1950), *aff'd after rehearing,* 71 Ariz. 161, 224 P.2d 650 (1950) (joint venture).

8. Partnership dissolution differs from termination of a partnership. Dissolution occurs at any time the relationship between or among partners changes or any partner ceases to be associated with the partnership. A.R.S. § 29–229. The partnership is not terminated at dissolution but may continue to operate until the winding up of partnership affairs is complete. A.R.S. § 29–230.

When Rhue and Dawson first met and formulated their partnership, they formed an oral partnership.[9] The terms of the oral partnership agreement are determined by the parties' intent as indicated by their conduct and statements. *Myers v. Rollette*, 103 Ariz. 225, 227, 439 P.2d 497, 499 (1968), *appeal after remand* 13 Ariz. App. 72, 474 P.2d 196 (1970); *Tripp v. Chubb*, 69 Ariz. 31, 34, 208 P.2d 312, 314 (1949).

In contesting the sufficiency of the evidence that he wrongfully dissolved the partnership, Dawson raises for the first time on appeal the question of the term of the partnership. The issues of the term of partnership and of whether Dawson rightfully dissolved a partnership "at will" or wrongfully dissolved a partnership "for a definite term" or "for a particular undertaking" were not raised at the trial court level. An issue may not be raised for the first time on appeal. *Richter v. Dairy Queen of S. Ariz., Inc.*, 131 Ariz. 595, 596, 643 P.2d 508, 509 (App.1982).

Nevertheless, we note that the record contains sufficient evidence for the jury to have found the partnership was one for a definite term or for a particular purpose, rather than a partnership at will. In determining the sufficiency of the evidence, we will not substitute our judgment for that of the jury as to credibility of witnesses or weight of the evidence. *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 286, 681 P.2d 390, 438 (App.1983). We view the jury's findings in the light most favorable to upholding the judgment. *All Points Towing, Inc. v. City of Glendale*, 153 Ariz. 115, 117, 735 P.2d 145, 147 (App. 1987).

Arizona law recognizes three types of partnerships differentiated by term: a partnership at will, a partnership for a particular undertaking, and a partnership for a definite term. *See* A.R.S. § 29–231(A). A partnership for a definite term or for a particular undertaking may be dissolved without violating the partnership agreement only at the end of the term or on completion of the undertaking. A.R.S. § 29–231(A)(1).

■ Only a partnership having no specified definite term or particular undertaking is a partnership at will. Such a partnership is subject to dissolution by express will of a partner without violating the partnership agreement. *See* A.R.S. § 29–231(A)(2); *Brand v. Elledge*, 101 Ariz. 352, 358, 419 P.2d 531, 537 (1966). Any partner who is ousted from the business in contravention of the partnership agreement has recourse through the wrongful dissolution provisions of the statute.[10] A.R.S. §§ 29–231(B), 29–238.

■ Evidence in the record supports a jury finding of a partnership other than one at will. Both parties testified they contemplated purchase of a single shopping center. The actions of the parties reflect that intention. Rhue located and negotiated the purchase of two adjacent parcels of land which were to be developed as a unified shopping center. He began to manage the parcels, to negotiate leases, and to plan and execute the redevelopment of those sites. Rhue and Dawson also intended to split the profits after Dawson received a preferred distribution of funds he had advanced to the partnership. The record contains no evidence that the parties anticipated future undertakings. All of this evidence suggests a partnership for a particular undertaking.

■ Alternatively, even if the original partnership were not formed for a particular undertaking, the jury could have found that it was for a definite term. When the

---

**9.** Dawson concedes for the purposes of his appeal that an oral partnership was formed in December, 1987; however, we note that the correct date would be December, 1986. The partnership was dissolved on June 18, 1987.

**10.** Rhue was ousted rather than expelled from the partnership. Expulsion of a partner can occur only if the partnership agreement provides for such expulsion and the expulsion occurs according to the provisions of the agreement. A.R.S. § 29–231(A)(4). In locking Rhue out of the partnership offices, Dawson was not acting in accordance with the provisions of any agreement between Rhue and Dawson. The partnership was, by that act, dissolved, and Rhue was ousted from the partnership.

parties did memorialize their agreement, the written Joint Venture Agreement stated a definite term for the partnership's existence as April 27, 1987, through "December 31, 2006, unless sooner dissolved or terminated." The agreement also provided for subsequent renewals in five-year increments. This evidence is sufficient to support a jury finding that the intent of the parties was to create a partnership for a definite term.

■ Whether the partnership was formed for a particular undertaking or for a definite term, sufficient evidence exists to support a jury finding that Dawson could dissolve the SCEA partnership only in accordance with the terms of the agreement. Dawson's attorneys delivered a letter notifying Rhue of the buyout and dissolving the partnership. Dawson locked Rhue out of the partnership offices. These actions effectively ousted Rhue as a partner and dissolved the partnership. The evidence supports a jury finding that Dawson's conduct wrongfully dissolved the partnership in contravention of the parties' agreement. *See generally* A.R.S. § 29–231(B) (enumerating the causes of dissolution).

### IV.

In addition to his other sufficiency of the evidence claims, Dawson asserts that the trial court had insufficient evidence to consider lost profits as an element of Rhue's compensable damages [11] for breach of the partnership agreement. Dawson argues that he should not be liable for lost profits when the value of the property had declined at some point subsequent to the dissolution. He also argues that an infant business and an inflated appraisal rendered Rhue's lost profits damages subject to conjecture and speculation and too uncertain to be recoverable.

### A.

■ Dawson frames his argument as one of insufficiency of the evidence. In actuality, some of Dawson's arguments appear to challenge indirectly the jury instruction on lost profits. Dawson has not preserved those arguments for appeal. Dawson's only objection to the lost profits instruction was as follows:

Just our objections to the instructions which only go to the extent that the instructions are being given on theories of the case that we don't think have been proven, should have been directed out, and I think yesterday we had discussion and tendered the various instructions which were refused, and we will make those part of the record. We think some of those instructions were a better statement of the law.

That's all I have. I have no other objections other than that, none to the form or content of the verdict forms.

This objection failed to state distinctly "the matter to which he objects and the grounds for his objection." Ariz.R.Civ.P. 51(a). A general objection is insufficient to constitute a distinct statement of the matter to which objection is made and supporting grounds therefor. *Long v. Corvo*, 131 Ariz. 216, 217, 639 P.2d 1041, 1042 (App. 1981).

Because Dawson did not preserve for appeal any issue relating to the jury instruction, our review is limited to determining whether sufficient evidence exists in the record to support a jury award of lost profits, assuming the correctness of the trial court's instructions.

### B.

The trial court instructed the jury that a partner who has been wrongfully excluded from the partnership has the right, as against the partner who wrongfully excluded him, "to damages for breach of the agreement, including loss of probable prof-

---

**11.** Rhue claimed the following elements of his damage claim: (1) the development fee he was promised; (2) his one-half share in the equity of the properties as of the date of dissolution; and (3) lost profits. Rhue calculated his lost profits as the difference between the appraisal value for the combined SCEA properties as if redeveloped according to plans and specifications prepared by SCEA and the cost of redevelopment.

its." Even though Dawson urges that Rhue's lost profits were uncertain and that the jury should not have been instructed to consider lost profits, the issue which we will address is whether the evidence was sufficient to support the verdict. Dawson asserts that the business was in its infancy and that the appraisal was inflated. Either factor, Dawson argues, rendered lost profits too uncertain as based on conjecture and speculation.

■ To prove lost profits, plaintiff must "establish[ ] a reasonably certain factual basis for computation of lost profits." *Rancho Pescado, Inc. v. Northwestern Mut. Life Ins. Co.*, 140 Ariz. 174, 184, 680 P.2d 1235, 1245 (App.1984). The standard is "that the existence of the profits cannot be nebulous, although there can be some uncertainty in fixing the measure or extent of those profits which certainly would exist." *Schuldes v. National Surety Corp.*, 27 Ariz.App. 611, 616, 557 P.2d 543, 548 (1976). Furthermore, the amount of Rhue's lost profits could not be based on conjecture and speculation. *See Earle M. Jorgensen Co. v. Tesmer Mfg. Co.*, 10 Ariz. App. 445, 452, 459 P.2d 533, 540 (1969).

■ Dawson first objects to the lost profits as too uncertain because SCEA was a new business. Rhue and Dawson operated SCEA for less than one year. This court has stated the appropriate burden for the plaintiff to prove lost profits in a new business:

The evidence required to prove loss of future profits depends on the individual circumstances of each case and, although absolute certainty is not required, the jury must be guided by some rational standard. In determining whether a plaintiff has met his burden, courts have considered the profit history from a similar business operated by the plaintiff at a different location.

*Short v. Riley*, 150 Ariz. 583, 586, 724 P.2d 1252, 1255 (App.1986). While SCEA was a new business association, the two pieces of property held by SCEA had been operated in the commercial real estate market for many years.

In addition, if the evidence establishes a reasonably certain factual basis for computing probable losses, recovery cannot be denied, even in a new partnership. 150 Ariz. at 585, 724 P.2d at 1254. The appraisal is sufficient evidence for the jury to determine Rhue's lost profits.[12] The appraiser estimated the value of the property based on the assumption that the property was to be developed in accordance with SCEA's plans and specifications. The date of the appraisal was sufficiently close to the date of dissolution to establish the market value of the finished project. The appraiser testified at trial, moreover, that he was satisfied with the accuracy of the valuation he performed two years earlier. The evidence also revealed that Dawson himself had utilized the same appraisal after the dissolution in various financial statements to a lending institution. Valuation methods utilized by the appraiser included comparable sales, net income, discounted cash flows, and replacement costs. The evidence was sufficient to support a jury award of lost profits.

12. Dawson relies on two cases which we do not find persuasive. In the first, *Weiner v. Ash*, 157 Ariz. 232, 756 P.2d 329 (App.1988), plaintiffs claimed that if they had not been injured by the defendant, they would have engaged in profitable transactions in unspecified parcels of real estate. Plaintiffs did not point to any specific amount of profit they lost on any particular parcel because of the injury caused by defendant. The court held that merely because plaintiffs had the resources to make, and had in the past made, profitable real estate deals did not mean that they would have realized profits but for the injury caused by defendant. In contrast, SCEA had purchased and held two particular parcels of real estate instead of being involved in an ongoing series of real estate transactions. Rhue was able to estimate his lost profits based on a market appraisal involving a single hypothetical sale, not a projection of ongoing profits from real estate sales as a business.

The second decision cited by Dawson dealt with an extremely risky catfish farm. *Rancho Pescado v. Northwestern Mut. Life Ins.*, 140 Ariz. 174, 185, 680 P.2d 1235, 1246 (App.1984). The court's opinion noted that catfish farming involved a ninety-five percent failure rate and uncertain cost, distribution, product, and other factors which affected profits. In contrast, Rhue and Dawson had reliable evidence of both costs and market value.

Dawson also claims that the appraisal value was too uncertain to support the award. He claims the appraisal was itself based on conjecture and speculation because the appraised valuation was determined by projecting value after development. We disagree.

■ Dawson himself obtained the appraisal only two months prior to the dissolution, submitted the appraisal to a lender as a valid basis for valuing the property as security for a loan, and later used the appraisal figures in pro forma financial statements and other documents. The appraiser also testified as to the validity of the appraisal at trial. Moreover, Dawson does not argue here, nor did he argue at trial, that the appraisal was too uncertain to be admissible as evidence. An objection to the admission of evidence raised for the first time on appeal is deemed to be waived. *Montano v. Scottsdale Baptist Hosp.*, 119 Ariz. 448, 453, 581 P.2d 682, 687 (1978).

Although development of the property was not accomplished as projected prior to the date of trial, several factors which hindered the project were of Dawson's own making. He failed to facilitate development and sale by refusing a cash settlement offer to settle a right-of-way dispute; by failing to employ a leasing agent which resulted in lost opportunities to secure leases of the shops; and by failing to follow through on negotiations with the two main tenants to obtain the necessary site approval.

■ While the property was not sold prior to trial to verify the appraised value, the appraisal nevertheless supplied a sufficient basis for the damage award. Requiring that the property actually be developed and sold would permit Dawson to insulate himself from significant liability. He could merely suspend efforts to develop, lease, or sell the property after he wrested control from Rhue.

■ Rhue presented sufficient evidence to establish the lost profits element of his damages. After demonstrating the existence of those damages, Rhue was not required to prove his damages with mathematical certainty but only to provide the jury with a rational basis to estimate his loss. *See Short*, 150 Ariz. at 585–586, 724 P.2d at 1254–1255. The evidence of the existence and amount of lost profits was sufficient to support the verdict in favor of Rhue.

### C.

■ Finally, Dawson claims that because the real estate market deteriorated after his breach, he should not be held accountable for the value of partnership property as of the date of the breach. Dawson's assertion that he should be given the advantage of a market fluctuation counters the general contract rule that where the "market fluctuat[es] after the contract is breached[, such fluctuations] are not relevant in measuring contract damages which are measured at the time of the breach." *Prospero Assoc. v. Redactron Corp.*, 682 P.2d 1193, 1198 (Colo.App. 1983).[13]

■ Dawson's claim that he should benefit from the market decline also failed to consider that the source of Rhue's damages is partnership law. Arizona has adopted the Uniform Partnership Act (UPA). The UPA protects an innocent partner in the event of a wrongful dissolution. Such a partner has the right to recover damages for breach of the agreement against each partner who causes the dissolution wrongfully. A.R.S. § 29–238(B). As the partner wrongfully excluded from the partnership, Rhue's damages caused by the breach may be measured as (1) his interest in the partnership as of the date of the breach and (2) his share of the profits which would have been made during the term of the partner-

---

13. The narrow holding of our decision in *Fairway Builders, Inc. v. Malouf Towers Rental Co.*, 124 Ariz. 242, 255, 603 P.2d 513, 526 (App.1979) is an exception to this rule and is not contrary to it. That decision allowed an *increase* in plaintiff's damages for breach of a construction contract where inflation would have made the measure of damages at the time of the breach inadequate to repair the damage caused by the breach.

ship. II REED ROWLEY & DAVID SIVE, ROW-LEY ON PARTNERSHIP § 48.30 (1960).

> [I]f one member assumes to dissolve a partnership before the end of the term, the other may bring an action for damages for the breach, and recover not only his interest, but also his share of the profits, which might have been made during the term. He need not wait until the expiration of the period, and need not go into equity for an accounting, but may at law show the probable profits which he has been deprived of.

*Id.* at pp. 239–240 (quoting *Zimmerman v. Harding,* 227 U.S. 489, 33 S.Ct. 387, 57 L.Ed. 608 (1913) (footnotes omitted); *see also* 68 C.J.S. *Partnership* § 132 (1950) ("In actions for breach of a partnership contract, an element of damages to be considered is the probable profits plaintiff would have made had not the partnership been wrongfully dissolved").

Measuring damages as of the date of breach is also sound policy. As discussed above, the evidence supports a conclusion that post-dissolution conduct by Dawson diminished the potential value of the property. Dawson wrongfully dissolved the partnership and immediately thereafter established himself as the sole proprietor over partnership assets. The adverse consequences of a controlling partner's delays and decisions which prevent the partnership from realizing the profits should be at that partner's risk, not at the risk of the ousted, innocent partner.

### V.

Dawson also contends that the jury lacked sufficient evidence of breach of fiduciary duty and violation of the Arizona civil racketeering statute. *See* A.R.S. §§ 13-2301, 13-2310, 13-2314. In the alternative, Dawson argues that the jury's verdict necessarily allowed Rhue to rescind the written agreement. If Rhue had elected to rescind, he would have been precluded from receiving any award of any damages. We will deal with these arguments in sequence.

■ First, the record contained sufficient evidence of breach of fiduciary duty.

A jury could have found that Dawson intentionally failed to disclose to Rhue that the agreement contained a buyout provision and that Dawson locked Rhue out of the partnership offices. A jury could have found that Dawson thereby breached his fiduciary duty to Rhue by failing to exercise the utmost good faith and by breaching the obligation of loyalty, fairness and honesty. *See DeSantis v. Dixon,* 72 Ariz. 345, 350, 236 P.2d 38, 41 (1951) (partnership); *Ghiz v. Millett,* 71 Ariz. 4, 8–9, 222 P.2d 982, 985 (1950), *aff'd after rehearing* 71 Ariz. 161, 224 P.2d 650 (1950) (joint venture). These same facts support a jury finding that Dawson violated the racketeering statute and was, therefore, liable for treble damages.

■ Dawson also overlooks the evidence relating to the plan to oust Rhue from the partnership. Dawson boasted to Rhue that he could oust Rhue from the partnership if Dawson did not like the "color of his socks." In addition, Dawson stated to one witness that he was going to get rid of Rhue. Finally, Dawson locked Rhue out of the partnership offices. The plan was more detailed than merely getting Rhue to sign the agreement with the buyout provision.

Sufficient evidence exists to support a jury finding that Dawson violated Arizona's civil racketeering statute whether or not the written agreement between Rhue and Dawson was rescinded. This evidence also supports the jury's verdict that Dawson breached his fiduciary duty and thereby became liable in damages.

Dawson's alternative argument is that Rhue elected the remedy of rescission by attacking the validity of the written partnership agreement. Rescission would return Rhue to the position he would have been in had he never entered into the written agreement, barring him from recovering damages. Dawson argues that by electing rescission of the written agreement, Rhue was left with an oral partnership agreement that was terminable at will. Because the oral agreement was termina-

ble at will, Dawson's dissolution of the partnership could not then be wrongful.

The difficulty with this argument is that even if the jury found the written partnership document not binding, it still had evidence from which it could find that the parties entered into an oral partnership agreement which was not terminable at will. Rhue was entitled to pursue the remedy of damages for breach of the partnership agreement whether oral or written.

## VI.

◼ Dawson next argues that his conduct was not sufficiently outrageous to justify either a jury instruction on punitive damages or an award of such damages by the jury. In reviewing the punitive damages award, this court must affirm "[a] jury's decision to award punitive damages ... if any reasonable evidence exists to support it. However, where the trial court submits the issue to the jury on slight and inconclusive evidence, an appellate court may correct the error." *Filasky v. Preferred Risk Mut. Ins. Co.,* 152 Ariz. 591, 599, 734 P.2d 76, 84 (1987).

◼ Rhue's claim for punitive damages is proper even though it arose out of a partnership. Generally, punitive damages are not appropriate in a contract action; however, Rhue also asserted a claim for fraud which supports the award of punitive damages. *Miscione v. Bishop,* 130 Ariz. 371, 374–375, 636 P.2d 149, 152–153 (App. 1981). In addition, under Arizona law, punitive damages are properly awarded for breach of fiduciary duty where the defendant's conduct reaches the requisite level of culpability. *Jerman v. O'Leary,* 145 Ariz. 397, 402, 701 P.2d 1205, 1210 (App. 1985). Further, this court has stated that both fraud and deliberate, overt, dishonest dealings will suffice to sustain punitive damages. *Farr v. Transamerica Occidental Life Ins. Co.,* 145 Ariz. 1, 8–9, 699 P.2d 376, 383–384 (App.1984).

◼ In determining Dawson's level of culpability, the jury had evidence before it that Dawson deliberately misled Rhue and intended to injure Rhue. Moreover, our supreme court has stated that the relationship between the parties affects whether punitive damages can be awarded. *Rawlings v. Apodaca,* 151 Ariz. 149, 163, 726 P.2d 565, 579 (1986). Rhue and Dawson were partners. Dawson failed to discharge his fiduciary duty and his duty to exercise the utmost good faith and to discharge the obligation of loyalty, fairness and honesty in his dealings with Rhue.

Furthermore, evidence of evil motives or malice necessary to support a punitive damage instruction "may be implied from the nature of the acts complained of and the circumstances." *Magma Copper Co. v. Shuster,* 118 Ariz. 151, 152, 575 P.2d 350, 351 (App.1977). Evidence of fraudulent and dishonest conduct will support a finding that the "defendant's conduct was guided by evil motives." *Rawlings v. Apodaca,* 151 Ariz. at 163, 726 P.2d at 579. The jury had before it sufficient evidence of fraud and dishonest conduct to infer that Dawson acted with an evil mind. Dawson deliberately failed to disclose to Rhue that the agreement signed by the parties contained a buyout provision. Dawson's employee testified that Dawson planned to dissolve the partnership. Dawson locked Rhue out of the partnership offices and exercised the buyout provision. Moreover, Dawson had made statements suggesting malicious intent. The jury could have inferred that Dawson's actions were "consciously malicious." *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 331, 723 P.2d 675, 680 (1986).

The jury could reasonably have found that Dawson's plan to dissolve Rhue's association with the partnership warranted punitive damages. We find no error in the award of such damages by the jury.

## VII.

◼ Dawson also questions whether punitive damages may be imposed in addition to civil racketeering treble damages under A.R.S. § 13–2314(A). This appeal appears to present this question for review for the first time in Arizona.

The Legislature's intent that both punitive damages and treble damages are re-

coverable is clear from the language and legislative history of the statute. A.R.S. § 13–2314(M) (1982) [14] initially read as follows:

> A civil action brought under this section is remedial and does not limit any other civil or criminal action under this article or any other provision. Civil remedies provided under this section are supplemental and not mutually exclusive.

The Arizona Supreme Court, interpreting that earlier statute, stated that "only when the predicate act ... rises to the level of a serious criminal offense [do] the RICO statutes ... appl[y] and allow a plaintiff the *recovery of damages which are punitive in nature." State ex. rel. Corbin v. Pickrell,* 136 Ariz. 589, 596, 667 P.2d 1304, 1311 (1983) (emphasis added).

In 1985, the Legislature amended A.R.S. § 13–2314(N). In plain and explicit language, the Legislature specifically declared that the remedy was *not* punitive in nature. A.R.S. § 13–2314(N) now reads as follows:

> A civil action authorized by this section ..., is remedial *and not punitive* and does not limit and is not limited by any other previous or subsequent civil or criminal action under this title or any other provision of law. Civil remedies provided under this title are supplemental and not mutually exclusive.

(Emphasis added.) This court, while considering an unrelated issue, has recognized that treble damages have non-punitive objectives:

> While admitting that actual damages can be recovered without a showing of scienter, defendants claim treble damages cannot because they are "punitive in nature." ... [S]uch damages are appropriate only where there is an intent to injure or a conscious course of conduct with knowledge that it creates a significant risk of harm to others.... A.R.S. § 13–2314(N) characterizes the civil remedy as "remedial and not punitive." We view this as akin to antitrust remedy of treble damages, which is intended not only to compensate for losses and to

deter from misconduct but also to encourage private litigants to supplement official enforcement of important criminal laws by providing an inducement for such action. This important public policy should not be undercut by engrafting on a legislative enactment court rules created for another purpose.

*DeJonghe v. E.F. Hutton,* 171 Ariz. 341, 345, 830 P.2d 862, 866 (App.1991). Other stated purposes for treble racketeering damages include compensation for lost opportunities and counterbalancing the difficulty of bringing such a suit. PAUL A. BATISTA, CIVIL RICO PRACTICE MANUAL § 5.19, at 136, § 5.23, at 141 (1991). In short, our Legislature has clearly indicated that civil racketeering treble damages may be simultaneously imposed with punitive damages.

Federal decisions interpreting the federal statutory counterpart to the Arizona provision are not persuasive. The federal civil racketeering statute, as contained in 18 U.S.C. § 1964(c), does not contain a provision parallel to A.R.S. § 13–2314(N). The federal statutory scheme does not specify whether it is remedial or punitive or whether the remedies provided are supplemental or mutually exclusive. It states only that a successful litigant "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." The federal courts are split on the issue of whether punitive damages may be imposed simultaneously with treble damages. Some courts view the federal racketeering statute as punitive, others as remedial. JED S. RAKOFF & HOWARD W. GOLDSTEIN, RICO: CIVIL AND CRIMINAL LAW AND STRATEGY § 4.03[4], at 4–28 (1991).

We therefore hold that, as a matter of express statutory language, Arizona civil racketeering actions provided for in A.R.S. § 13–2314(A) are remedial in nature, and treble damages awarded under the statute are supplemental to other damages and not mutually exclusive. *But cf. Healey v. Coury,* 162 Ariz. 349, 356–357, 783 P.2d 795, 802–803 (App.1989) (civil racketeering

---

**14.** The Legislature added this subsection to A.R.S. § 13–2314 by Laws, 1982, Ch. 200, § 3; in 1985, this subsection was redesignated as subsection N.

damages are not remedial; however, holding limited to the prospective nature of the statute). The statute is intended to allow successful litigants to receive both treble racketeering damages and punitive damages. The trial court in this case properly awarded both.

 Dawson also complains that the trial court should have informed the jury prior to its fixing punitive damages that the consequence of imposing the quasi-criminal racketeering sanction would be to treble the compensatory damages. The jury determines the amounts of compensatory damages and punitive damages and also determines whether the party charged committed any predicate act under the racketeering statute. The trebling is automatic and is entered by the judge into the judgment.[15] The jury is not informed of the trebling effect of its finding that a party violated the racketeering statute. *Cf. Pollock & Riley, Inc. v. Pearl Brewing Co.,* 498 F.2d 1240, 1242–43 (5th Cir.1974), *cert. denied sub nom. Gulf Oil Co. v. Wood,* 420 U.S. 992, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975) (an antitrust case).

Thus, the jury is not allowed to consider the trebling in calculating an appropriate amount of punitive damages. Informing the jury of trebling might thwart the purpose of the statute by inducing the jury to reduce or even eliminate damage awards:

> The primary policy supporting our decision [to prohibit informing the jury that damages awarded in the verdict will be trebled] is that underpinning the tripling provision itself. The purpose of treble damages is to deter violations and encourage private enforcement of the antitrust laws. *The justifiable fear of antitrust plaintiffs is that the juries will adjust the damage award downward or find no liability, therefore thwarting Congress's purpose,* because of some notions of a windfall to the plaintiff. One court has even suggested that a jury might take the revelation of the treble

damage provision as an intimation from the court to restrict the amount of damages. In sum, we agree with the Court of Appeals for the Tenth Circuit that informing a jury would serve no useful function and its probable consequences would be harmful—an impermissible lowering of the amount of damages.

> Second, it is not for the jury to determine the amount of a *judgment.* Its function is to compute the amount of *damages.* Congress's authorization in 15 U.S.C.A. 15 to triple the award of damages is a matter of law to be applied by the district court without interference from the jury.

*Id.* (first emphasis added) (footnote omitted).

 When viewed in isolation from the rest of the damage award, the award of punitive damages in this case, is not, per se, outrageously excessive and does not suggest passion or prejudice. A punitive damages award may be excessive, however, in light of the trebling of actual damages.

The amount of punitive damages should be based in part on the defendant's wealth in order to achieve the appropriate level of punitive effect. *Maxwell v. Aetna Life Ins. Co.,* 143 Ariz. 205, 218–219, 693 P.2d 348, 361–362 (App.1984). While the "verdict must be sufficient to punish and deter others in similar circumstances," the damages imposed "must not kill the defendant." *Id.* However, a significant treble damage award reduces the defendant's wealth and might render any punitive award excessive. *See Al–Kazemi v. General Acceptance & Inv. Corp.,* 633 F.Supp. 540, 543–544 (D.D.C.1986).

 The punitive damage award in this case is arguably excessive in light of the trebling effect of the racketeering statute. Actual compensatory damages were $2,081,710, which equalled $6,245,130 when trebled. Punitive damages were $2,000,-

---

**15.** Under the statute, a trial judge must award treble damages if a plaintiff prevails on a complaint alleging a civil racketeering violation. The trial court judge has no discretion to withhold such damages. *Daggett v. Jackie Fine Arts, Inc.,* 152 Ariz. 559, 568–569, 733 P.2d 1142, 1150–1151 (App.1986).

000, and attorneys' fees were $134,209, for total damages of $8,379,339.

The trial court may review an award of punitive damages and may reduce a verdict it finds excessive. *Braun. v. Moreno*, 11 Ariz.App. 509, 512, 466 P.2d 60, 63 (1970). A trial court has discretion in exercising its power of remittitur. *Spur Feeding Co. v. Fernandez*, 106 Ariz. 143, 149, 472 P.2d 12, 18 (1970).

Appellate courts will not interfere with the jury verdict on damages unless the verdict is not supported by the evidence, *Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 599, 734 P.2d 76, 84 (1987), or unless it is "so outrageously excessive as to suggest, at first blush, passion or prejudice." *Magma Copper Co. v. Shuster*, 118 Ariz. 151, 154, 575 P.2d 350, 353 (App. 1977).

In short, no bar exists to the award of both treble damages and punitive damages. At the same time, the trial court is permitted to consider the amount of compensatory damages, including treble damages, in exercising its discretionary power to review punitive awards for excessiveness.

Prior law was unclear as to whether the trial court could consider the effect of the trebled award in assessing the propriety of the punitive award. Therefore, we remand for the trial court to reconsider Dawson's motion for new trial in part. The court may review the amount of punitive damages in light of the trebled compensatory damages to ensure that the former are not excessive. As we noted above, the trial court has broader discretion in the scrutiny of the award than we exercise. Our remand intimates no view on our part that the damages are or are not excessive in this case.

Another possible approach to avoid excessive punitive awards in treble damage cases, and one which relieves trial judges of their burden of weighing the effect of treble damages, is to bifurcate the jury determination of compensatory damages and of punitive damages. The jury could be instructed as to compensatory damages and told to make findings whether a racketeering violation has occurred and whether punitive damages should be awarded. After the jury returns its verdict, the trial court could instruct the jury that trebling of the actual damages is mandatory, followed by an instruction to fix the amount of punitive damages.

This procedure would ensure that juries would not improperly reduce compensatory damages because they had been informed of mandatory trebling prior to fixing the amount of those damages. Yet the procedure would arm the jury with all relevant information prior to its decision on the proper amount of punitive damages.

## VIII.

The judgment is affirmed in this case, with the exception of the amount of the punitive damages. We remand to the trial court for its review of the punitive award in accordance with this opinion. Each party is to bear his own attorneys' fees on appeal.

KLEINSCHMIDT, J., concurs.

GERBER, Judge, specially concurring.

Although the majority is insightful in its statutory exegesis, its herculean effort to make sense of the Rico damage statutes leads to a result which, to my mind, is an anomaly if not an absurdity, namely that a civil jury may simultaneously award both treble damages and punitive damages for the same conduct. Treble damages by their very nature are punitive; they seek to deter, to punish, to set an example, precisely as do punitive damages. Admittedly the latest amendment seeking to clarify A.R.S. § 13–2313(N) states that civil damages for racketeering are "not punitive" nor are they "exclusive." This language does support the majority's reasoning. However, given the prosecution's involvement in the enactment and repeated amendment of this statutory labyrinth, a more palatable reading of that statute is not that it authorizes both treble and punitive damages but seeks only to assure that any and all criminal proceedings remain viable despite any kind of civil damage verdict. I concur rather than dissent because the precise language

of the statute does support the majority's position, recalling again that statutory language rather than statutory wisdom is our domain—except for eighth amendment concerns, which are not raised here.